In re NATIONAL AUDIT DEFENSE
NETWORK, Debtor.

William A. Leonard, Jr., Chapter
7 Trustee, Plaintiff,

v.

Optimal Payments Ltd. (f/k/a SF Online
Processing Ltd.); Optimal Payments
Corporation; and Optimal Payments
Inc., Defendants.

Bankruptcy No. BK–S–03–17306–BAM.
Adversary No. 04–1261.

United States Bankruptcy Court,
D. Nevada.

June 23, 2005.

William A. Leonard, Las Vegas, NV, Chapter 7 Trustee.

Barton L. Jacka, Esq., Las Vegas, NV, for trustee.

Behnam Dayanim, Esq., Patrick J. Tongi, Esq., Paul, Hastings, Janofsky & Walker LLP, Washington, DC, Nile Leatham, Esq., James B. MacRobbie, Esq., Las Vegas, NV, for Defendants.

## MEMORANDUM ON DEFENDANTS' MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

BRUCE A. MARKELL, Bankruptcy Judge.

This case involves the ability of a party to a merchant credit card processing agreement to obtain payment, as well as an accounting, of funds collected by the other party. On one side is William A. Leonard, Jr., the trustee (Trustee) of the debtor National Audit Defense Network, Inc. (NADN). On the other side is Optimal Payments, Ltd., a corporation incorporated under the laws of England and Wales (OPL) and a Canadian corporation known as Optimal Payments, Inc. (OPI). OPL and OPI will be referred to collectively as "Optimal,"[1] and their relative identities and roles will be made known in due course.

By his action, the Trustee seeks damages for breach of the credit card processing agreement, as well as an accounting for, and a turnover of, more than $1 million of credit card payments processed under that agreement. Optimal counters

---

1. As originally filed, the complaint also named a Delaware corporation named Optimal Payments Corporation (OPC) as a defendant. OPC is alleged to be a wholly owned subsidiary of OPI, and as a result, OPL and OPC are corporate siblings with a common parent, OPI. By order dated March 7, 2005, however, the court approved the parties' stipulation dismissing OPC from the case without prejudice. Due to this dismissal, this memorandum will not refer to OPC.

that none of the funds identified in the complaint belongs to the Trustee or his estate, and in any event, OPC is not subject to jurisdiction in this forum. The court has once before sustained Optimal's motion, and the Trustee returned with an amended complaint. This time, the court overrules the jurisdictional objections, dismisses the Trustee's claims for turnover and an accounting, and orders Optimal to answer the breach of contract claims and the various bankruptcy avoidance actions alleged by the Trustee within thirty days of the entry of this memorandum.

## Background Facts

NADN engaged in selling dodgy tax advice to those predisposed to hear its message. It collected (some might say bilked) millions of dollars from thousands of individuals during its relatively short life. Some of these individuals paid cash, but most paid by that ubiquitous emblem of consumer finance, the credit card.[2] That is where Optimal, in all its various forms, joined the picture.

In August 2002, NADN entered into a credit card processing agreement (Agreement)[3] with SF Online Processing, Ltd. (SF). Through processes unknown, SF became OPL at some time before the Trustee filed his complaint. OPL is alleged to be a wholly owned subsidiary of OPI.

The complaint alleges that, in various ways that are at best generally described, OPL and OPI participated in processing NADN's prepetition and postpetition credit card receivables. It also alleges that OPL holds, or held, $957,984 of credit card payments made prepetition to NADN, and $92,037 in similar postpetition credit card

receivables. Against these amounts, the Trustee alleges that OPL improperly assessed fines of $97,325 prepetition, and $344,650 post-petition. Finally, the complaint also alleges that OPL imposed an unspecified amount of "improper and unjustified" chargebacks against amounts held by OPL but collected for NADN.

The Trustee wants the funds, and wants the fines and chargebacks reversed. It predicates its request upon breach of contract, plus an array of equitable and bankruptcy-based claims for relief. OPI claims that this court does not have jurisdiction over it, and OPL contends that any funds it retains it owns outright, and that it has already given the Trustee an adequate accounting.

## Legal Background and Analysis

### A. *Jurisdiction*

■■■ Optimal seeks to dismiss the complaint as to OPI, the Canadian parent, alleging that this court does not have personal jurisdiction over it. This claim is made under Rule 12(b)(2) of the Federal Rules of Civil Procedure, made applicable by Rule 7012 of the Federal Rules of Bankruptcy Procedure. Under Rule 12(b)(2), it is the Trustee's burden to establish personal jurisdiction. *Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1128–29 (9th Cir.2003); *Doe, I v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir.2001) (per curiam). Here, without an evidentiary hearing, the Trustee need only make a prima facie showing of jurisdiction to avoid the defendant's motion to dismiss. *Harris Rutsky*, 328 F.3d at 1129. Put another way, the Trustee "need only demonstrate facts that if true would support jurisdiction over the

---

**2.** As one text puts it: "Credit cards are now more common than apple pie." DELLAS W. LEE & TIMOTHY R. ZINNECKER, PAYMENT SYSTEMS, BANKING AND DOCUMENTARY TRANSACTIONS 305 (2003)

**3.** The full name of the Agreement is the "Processing Services Agreement Dated this 22nd Day of August 2002."

defendant." *Unocal,* 248 F.3d at 922, *quoting Ballard v. Savage,* 65 F.3d 1495, 1498 (9th Cir.1995). As stated in *Harris Rutsky,* "[u]nless *directly* contravened, [the Trustee's] version of the facts is taken as true, and 'conflicts between the facts contained in the parties' affidavits must be resolved in [the Trustee's] favor for purposes of deciding whether a prima facie case for personal jurisdiction exists.'" *Harris Rutsky,* 328 F.3d at 1129, *quoting Unocal,* 248 F.3d at 922, *in turn quoting AT & T v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 588 (9th Cir.1996).[4]

■ Where, as here, there is no applicable federal statute governing personal jurisdiction, the law of the state in which the trial court sits applies. *Core–Vent Corp. v. Nobel Industries AB,* 11 F.3d 1482, 1484 (9th Cir.1993). As a consequence, the Trustee must show (1) that Nevada's long-arm statute confers personal jurisdiction over Optimal and (2) that the exercise of jurisdiction comports with the constitutional principles of due process. *See Rio Properties, Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1019 (9th Cir.2002). Nevada's long-arm statute permits the exercise of jurisdiction to the same extent as the United States Constitution. NEV. REV. STAT. § 14.065 (2001). Hence, the court "need only determine whether personal jurisdiction in this case would meet the requirements of due process." *Brainerd v. Governors of the Univ. of Alberta,* 873 F.2d 1257, 1258 (9th Cir.1989).

■ Due process requires "that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945), *quoting Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940). To determine whether a court may exercise jurisdiction over the defendants, there must be either general jurisdiction or specific jurisdiction.

### 1. *General Jurisdiction*

■ For general jurisdiction to exist over a nonresident defendant, the defendant must engage in "continuous and systematic general business contacts" with the state in which the forum is located. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984), *citing Perkins v. Benguet Consol. Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952). These contacts must "approximate physical presence" in the forum state. *Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 801 (9th Cir.2004), *citing Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.,* 223 F.3d 1082, 1086 (9th Cir.2000). As pointed out in *Schwarzenegger,* "[t]his is an exacting standard, as it should be, because a finding of general jurisdiction permits a defendant to be haled into court in the forum state to answer for any of its activities anywhere in the world." *Schwarzenegger,* 374 F.3d at 801.

---

4. Optimal has moved for partial summary judgment on jurisdiction, and has submitted numerous declarations regarding the jurisdictional facts. Notwithstanding these submissions, no party requested an evidentiary hearing, and thus none of the declarations have been subject to cross examination or further discovery. In such a context, the court relies on the statement in *Harris Rutsky* that there must be direct contravention of otherwise well pled facts to unsettle the Trustee's jurisdictional allegations. *Harris Rutsky,* 328 F.3d at 1129; *see also Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.,* 223 F.3d 1082, 1085–86 (9th Cir.2000).

In support of general jurisdiction over OPI, the Trustee points to a common website maintained by the Optimal group of companies that is accessible in Nevada.[5] With the rise of Internet activity and commerce over the last decade or so, American courts have struggled with applying traditional notions of jurisdiction to those who maintain websites that can be viewed from any computer anywhere in the world. Does posting a website on the Internet establish the "minimum contacts" necessary for jurisdiction everywhere?

After initially toying with the idea that jurisdiction could be found anywhere that a website could be viewed, courts subsequently rejected that view. They adopted stricter tests, requiring, in general, some interactivity between a viewer in the forum state and the website or, alternatively, evidence that the website specifically targets users in that state. *See generally* 4A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 1073.1 (2002 & Supp.2005). Despite these efforts, no bright-line rule has yet emerged that a court can easily apply to determine whether it has jurisdiction over a company that invites and conducts business over the Internet. *See* Allan R. Stein, *Personal Jurisdiction and the Internet: Seeing Due Process Through the Lens of Regulatory Precision,* 98 NW. U.L.REV.411 (2004).

In the present case, while OPI maintains a website for its various credit card payment enterprises, its website almost certainly does not meet the test for general jurisdiction, which, as stated before, requires that the company engage in "continuous and systematic general business contacts," *Helicopteros Nacionales,* 466 U.S. at 416, 104 S.Ct. 1868, that "approximate[s] physical presence" in the forum state. *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.,* 223 F.3d 1082, 1086 (9th Cir.2000).

The Ninth Circuit held last year that an Ohio business with several attenuated connections to California and "an Internet website accessible by anyone capable of using the Internet, including people living in California" fell "well short of the 'continuous and systematic' contacts that the Supreme Court and this court have held to constitute sufficient 'presence' to warrant general jurisdiction." *Schwarzenegger,* 374 F.3d at 801. If there were insufficient contacts to establish general jurisdiction in *Schwarzenegger,* there are even fewer contacts in the present case.

So much for general jurisdiction.

### 2. *Specific Jurisdiction*

Next we turn to specific jurisdiction, which is available in causes of action that "arise out of" or "relate to" a defendant's activities within a state. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). The Ninth Circuit applies the following three-part test with respect to specific jurisdiction:

(1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privileges of conducting

---

5. Optimal does not contend that this court does not have jurisdiction over OPL. OPL knowingly entered into a contract with a Nevada corporation that it knew was doing substantial business in Nevada. In so doing, it availed itself of the benefits and burdens of doing business in Nevada, and at least is amenable to special jurisdiction in this court with respect to the Agreement, the classic form of "purposeful availment." See Part A.2. below; 16 MOORE'S FEDERAL PRACTICE § 108.44[2] (3d ed.2005).

activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Harris Rutsky,* 328 F.3d at 1129, *quoting Core–Vent,* 11 F.3d at 1485, *in turn quoting Lake v. Lake,* 817 F.2d 1416, 1421 (9th Cir.1987). *See also Cybersell, Inc. v. Cybersell, Inc.,* 130 F.3d 414, 418 (9th Cir. 1997).

 In the current case, the plaintiff seeks to recover money for the debtor's estate from OPI and its subsidiary, OPL. NADN had a contract with OPL, which, along with its parent, maintained an interactive website at www.optimalpayments.com. Optimal argues that because OPI thus has no physical presence in the United States, it follows that this court has no jurisdiction, general or specific, over it.

 But that argument ignores the fact that the complaint can be fairly read to allege that OPI is the agent of OPL, with whom the debtor, NADN, had contracted to handle NADN's customers' credit card payments. As described in recent and controlling Ninth Circuit opinions, an agency relationship can establish jurisdiction. As stated in *Unocal,* "[t]he agency test is satisfied by a showing that the subsidiary functions as the parent corporation's representative in that it performs services that are 'sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services.'" *Unocal,* 248 F.3d at 928, *quoting Chan v. Soc'y Expeditions, Inc.,* 39 F.3d 1398, 1405, (9th Cir.1994), *in turn quoting Gelfand v. Tanner Motor Tours, Ltd.,* 385 F.2d 116, 121 (2d Cir.1967).

"Consequently, [t]he question to ask is ... whether in the truest sense, the subsidiaries' presence substitutes for the presence of the parent." *Unocal,* 248 F.3d at 928–29, *quoting Gallagher v. Mazda Motor of America, Inc.,* 781 F.Supp. 1079, 1083–84 (E.D.Pa.1992).

The *Unocal* court also stated that "the *Chan* court explained that courts have permitted the imputation of contacts where the subsidiary was 'either established for, or is engaged in, activities that, but for the existence of the subsidiary, the parent would have to undertake itself.'" *Unocal,* 248 F.3d at 928, *quoting Gallagher,* 781 F.Supp. at 1083.

In the case before this court, although the agency direction is reversed—it is the parent who is alleged to be the agent of the subsidiary—the alleged activities of OPI squarely satisfy the but-for test in the paragraph above. The declaration of Doug Lewin, executive vice president of OPI, which was filed in support of Optimal's motion to dismiss, says that OPI's "principal activity is to provide support services for its subsidiaries. [It] performs processing, customer support, sales, technical, and related services. These services account for over 95 percent of [OPI's] annual revenues. All of these services are performed by [OPI's] employees based in [its] Montreal offices." ¶ 7 of Exhibit A of Optimal's motion to dismiss adversary proceeding, filed October 15, 2004, Docket # 4.

This court concludes that the complaint, fairly read, alleges that if OPL, which was doing business in the United States, did not have OPI in Montreal to perform the very services that OPL had contracted with NADN to perform, OPL would have had to perform them itself. OPI may not avoid jurisdiction in the United States by conveniently interposing a subsidiary be-

tween its acts and the debtor. As the complaint alleges facts that, if proved, would establish that OPI was the agent of OPL, which in turn was soliciting and doing business over the Internet with companies in the United States, it follows that specific jurisdiction therefore attaches to both. Optimal's motion to dismiss for lack of jurisdiction is therefore denied.

### B. *Motion to Dismiss or Partial Summary Judgment on Substantive Grounds*

Optimal has also moved to dismiss this adversary proceeding (or various parts of it) under Rule 12(b)(6) of the Federal Rule of Civil Procedure, made applicable here by Rule 7012 of the Federal Rules of Bankruptcy Procedure. Their contentions are that:

(1) The funds identified in the Trustee's complaint are, by law, not property of NADN's estate, and thus there is no basis for a turnover action, and the Third Claim for Relief should be dismissed;

(2) As an alternative to the first point, and to the extent that Section 542 authorizes turnover, the contested nature of any amounts owing under the Agreement preclude turnover, and thus the Third Claim for Relief seeking turnover is inappropriate, and should be dismissed;

(3) As most of the postpetition transfers identified in the complaint are in reality prepetition transfers, the Trustee's Second Claim for Relief, based upon Section 549, should be dismissed;

(4) OPI, if subject to jurisdiction in this court, is at most a mediate, or secondary, transferee, and thus any suit seeking to recover a transfer to OPI based upon the invalidity of the transfer to OPL is premature. In essence, Optimal seeks to require the Trustee to pre-

vail on its various avoidance lawsuits against OPL before OPI can be compelled to respond to an avoidance action under Section 550;

(5) The breach of contract action against OPL contains no genuine issues of material fact, and thus summary judgment on the breach of contract claim contained in the Trustee's Fifth Claim for Relief is appropriate;

(6) Inasmuch as OPL has already provided an accounting to the Trustee, the First Claim for Relief for an accounting is moot and should thus be dismissed; and

(7) In any event, since OPI was not a party to the Agreement, no action in accounting or any other claim for relief based upon consent may lie against OPI.

#### 1. *Standards Applicable to the Motion Made Before Answer Filed*

The standard under Rule 12(b)(6) is high: the court must take every well pled fact in the complaint as true, and it may then grant the motion only if it appears beyond a doubt that the Trustee can prove no set of facts that would entitle it to relief. *Zimmer v. PSB Lending Corp. (In re Zimmer)*, 313 F.3d 1220, 1222 (9th Cir.2002), *citing Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In this context, a court must evaluate the legal feasibility of the complaint, not the evidence that may be offered to support it. *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir.1998).

#### 2. *Assessment of Contentions That Particular Claims Should be Dismissed*

Optimal has made seven separate arguments as to why some or all of the claims for relief in the Trustee's complaint should be dismissed. The court addresses each of these arguments below.

### a. Turnover of Funds Collected Under the Agreement That Are Estate Property Under Section 542(a)

The Trustee claims that Optimal holds property of the estate in the form of funds paid to Optimal by NADN's customers. Section 542(a) of the Bankruptcy Code provides that:

> an entity ...in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title ... shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

The Trustee's complaint alleges that Optimal holds over $1 million in collections under the Agreement that are payable to the Trustee as successor to NADN under Section 541(a). Optimal counters that controlling British law is clear that neither NADN nor the Trustee has any claim of title to any of these funds.

In their arguments, the parties consistently confuse two ancient notions: property rights and personal rights. Property rights leading to recoverable assets under Section 542(a) would be at issue if Optimal, as NADN's agent, collected and held money or tangible funds that were rightfully NADN's or the Trustee's, and agreed (or was compelled) to hold such funds separate and apart from all others. This could have occurred if Optimal had agreed to act as a trustee or as some other type of fiduciary with respect to the money collected for NADN from NADN's customers. Clearly, if such a relationship existed, and the estate had any legal interest in property held by Optimal (that is, if Optimal held estate property), the Trustee could seek its recovery in a turnover action using Section 542(a). *See, e.g., Cates–Harman v. Stage (In re Stage)*, 85 B.R. 880

(Bankr.M.D.Fla.1988) (debtor received an engagement ring from future husband, and maintained that ring was his; but under Florida law gift was conditional, with the debtor retaining a legal interest as of the petition date; debtor required to turnover ring to trustee).

Such relationships of trust, however, are relatively rare in commercial transactions. Courts do not lightly find such a relationship if the nature of the transaction appears to be an everyday commercial transaction. *In re Marchiando*, 13 F.3d 1111 (7th Cir.), *cert. denied,* 512 U.S. 1205, 114 S.Ct. 2675, 129 L.Ed.2d 810 (1994); *Walsh v. Pennsylvania Dep't Pub. Welfare (In re Kingsley)*, 181 B.R. 225, 233 (Bankr. W.D.Pa.1995). *See also* George Gleason Bogert & George Taylor Bogert, The Law Of Trusts And Trustees § 19 (Rev.2d ed.2004).

In rebutting the Trustee's property-based arguments, Optimal essentially adopts this position and contends that the nature of its relationship with NADN created only unsecured, personal, obligations, not trust or other property-based obligations. Indeed, Optimal's argument is that all that is at issue in this case are personal rights—better known as unsecured debts.

Optimal initially notes that the Agreement is "governed by and construed in accordance with the laws of England and Wales" (Section 12.8). From this uncontested premise, it then argues that applicable British case law establishes that the funds (or proceeds of funds) that NADN's customers paid by credit card belong to Optimal and not to NADN. It arrives at its conclusion from the nature of the transaction as memorialized in the Agreement, and some venerable legal principles. We look first at the transaction.

Pursuant to the Agreement, Optimal agreed to handle all NADN's credit card transactions. To perform these duties, Optimal had to contract with banks and others who had issued credit cards to NADN's customers. When NADN's customers then wanted to purchase services from NADN on those credit cards, Optimal would essentially collect their request and accompanying credit information and forward it to the bank who issued the customer's credit card. The bank receiving such information would then extend the credit requested by remitting funds to Optimal (or, to be accurate, Optimal's bank), who would in turn remit the funds to NADN. As a consequence, by the time Optimal "owed" anything to NADN, it had already collected funds, but *not* from NADN's customers. Rather, the funds were collected from NADN's customers' banks, usually before those banks had been paid by their customers for the credit extended. Those customers would then pay the banks issuing the credit cards according to the terms established in the agreements under which the banks issued credit cards to NADN's customers.[6]

That this set of relationships is standard is confirmed by those cases involving similar requests for turnover of funds held by nondebtor credit card processors. *See, e.g., Sherman v. First City Bank (In re United Sciences of Am., Inc.),* 893 F.2d 720, 721–22 (5th Cir.1990); *In re Nat'l Hydro–Vac Indus. Services, L.L.C.,* 262 B.R. 781, 783–84 (Bankr.E.D.Ark.2001); *Shugrue v. Chemical Bank, Inc. (In re Ionosphere Clubs, Inc.),* 177 B.R. 198, 199–201 (Bankr.S.D.N.Y.1995); *Health Sci.* *Products, Inc. v. AmSouth Bank, N.A. (In re Health Sci. Products, Inc.),* 181 B.R. 121, 123 (Bankr.N.D.Ala.1994); *Moratzka v. Visa, U.S.A. (In re Calstar, Inc.),* 159 B.R. 247 (Bankr.D.Minn.1993) (arrangement set up postpetition).

In this light, it can be seen that Optimal never received funds directly from NADN's customers. Indeed, Optimal's obligation to pay NADN anything, as well as its receipt from the credit card charges, arose before NADN's customers typically paid a dime to Optimal.[7] As a consequence, Optimal was not required to pay to NADN the money (in currency or coin) that NADN's customers paid Optimal; rather, Optimal was required to pay NADN an amount equal to the amount of such funds—a distinction with a decided difference. Of course, as provided in the Agreement, Optimal ultimately would be entitled to deduct any of Optimal's agreed fees and charges from such payments; that is the function and purpose of the Agreement. Under this latter interpretation, NADN would have, at best, a personal—that is, unsecured—claim against Optimal, subject to the possibility that Optimal would have some claim for offset or recoupment against NADN.

This analysis of the flow of funds establishes that the Trustee is without any property rights upon which to base a claim under Section 542(a). As outlined above, there is no reason to believe that the money or other funds paid to Optimal by NADN's customers' banks was paid other than through normal banking channels. If, as is likely, Optimal (or to be more

---

6. Indeed, if one of NADN's customers paid NADN's fee by credit card, and then chose to pay the amount charged over time (and with interest), it is then possible that Optimal would have received funds related to that purchase long before the customer paid anything.

7. Or, to be more precise, before they paid a dime to the banks who had issued the credit cards used to pay for NADN's services.

precise, Optimal's bank) received the funds by electronic funds transfer from the banks who issued credit cards to NADN's customers, title to those funds vested in Optimal upon completion of the transfer and acceptance by Optimal's bank. *Community Bank, FSB v. Stevens Financial Corp.*, 966 F.Supp. 775, 786 (N.D.Ind.1997) ("the ownership interest in funds transferred by a payment order passes from the originator to the beneficiary's bank upon completion of the transfer and acceptance by the receiving bank"); *Pioneer Comm. Funding Corp. v. Apple Bank (In re Pioneer Comm. Funding Corp.)*, 140 B.R. 951, 957 (Bankr.S.D.N.Y.1992) ("wire payments are the equivalent of honored funds and are deemed transferred when the recipient receives the electronic transmission"). *See also* FRED H. MILLER & ALVIN C. HARRELL, THE LAW OF MODERN PAYMENT SYSTEMS § 10.07 (2003); UNIFORM COMMERCIAL CODE §§ 4A–404 to 4A–406 (2000).[8] Thus, when Optimal obtained funds directly or indirectly from NADN's customers (or, more precisely, from NADN's customer's banks), it held title to them—and also held a corresponding obligation created by the Agreement to pay them, less its fees, to NADN.

Optimal supports this argument with a declaration of a British barrister as to the effect of English law on title to the funds. The declaration as supplemented opines that the "monies in the Reserve Account are OPL's property." Cited in support of this proposition are various English authorities which stand for the proposition that a debtor's grant of security in the secured creditor's obligation to pay the debtor something—usually a bank account—is not inconsistent with ownership by the secured party of the funds or currency underlying the deposit. *See In re Charge Card Services, Ltd.*, [1986] All E.R. 289, aff'd [1988] 3 All E.R. 702 and *Royal Trust Bank Plc v. National Westminister Bank Plc*, [1996] 2 BCLC 699. Although not quite on point, and superceded by other, and better authority, *e.g., In re Bank of Credit & Commerce Int'l*, [1998] A.C. 214 (House of Lords), the authorities cited ultimately support Optimal's position.[9] As a consequence, Optimal argues that it thus has no obligations to turnover any funds whatsoever to NADN, for the simple reason that the funds were never NADN's.

These English authorities recognize a point well-established in the United States—that a deposit or bank account is not shorthand for the bank's holding of specific funds and currency in its vault. Rather, they recognize that the bank/depositor relationship is contractual, and creates, at most, an unsecured claim held by the customer against its bank.[10] Closely

---

8. In the unlikely case that Optimal was paid by check or currency, the consequences attendant to delivery of any instrument (such as a check) or cash leads to the same result. *Rankin v. Chase Nat'l Bank*, 188 U.S. 557, 565, 23 S.Ct. 372, 47 L.Ed. 594 (1903) (currency); *Ragsdale v. South Fulton Mach. Works, Inc. (In re Whitacre Sunbelt, Inc.)*, 211 B.R. 411, 417 (Bankr.N.D.Ga.1997) (same); *Collins v. Gilbert*, 94 U.S. 753, 754, 24 L.Ed. 170 (1876) (bearer instruments); U.C.C. § 3–203(a) (2000) & cmt. 1 ("Ownership rights in instruments may be determined by principles of the law of property, independent of Article 3 . . . .")

9. This position is also supported by significant secondary authority interpreting applicable British law. *See, e.g.,* Jessica Young, *Charge Over Book Debts: Siebe Gorman Revisited*, 15 INT'L CO. & COMM. L. REV. 327 (2004); Edwin. C. Mujih, *Legitimising Charge–Backs*, INSOLVENCY L.J.3 (Feb.2001); Roy Goode, *Charge–Back and Legal Fictions*, 114 LAW Q. REV. 178 (1998).

10. Under Nevada law, once possession of money is given to a bank, the money becomes property of the bank. This is clear under Nevada law:

aligned to this point is the issue addressed in the foreign authorities Optimal cites: whether a creditor who owes money under an agreement (such as a bank which owes a duty to its customers to pay its customers' checks upon presentment) can take as security for the other party's performance its own debt to the other party. In the context of the cases cited by Optimal, the issue is whether a bank can take its customer's right to compel the bank to pay sums on demand as security for the customer's obligations to the bank.[11]

But all of this is a far cry from the transactions as described by the Trustee. The Trustee alleges a series of transfers completely at odds with the flow of funds as contemplated in the Agreement, and as described by courts faced with similar issues. *See* BARKLEY CLARK AND BARBARA CLARK, THE LAW OF BANK DEPOSITS, COLLECTIONS AND CREDIT CARDS ¶ 15.02[4][B] (2005); MILLER & HARRELL, *supra* at § 11.01; DELLAS & ZINNECKER, *supra* at 305–06; cases cited at page 13 *supra*.[12]

Either the Trustee has mischaracterized the transactions, or Optimal has. The court sides with Optimal. Rather than a series of entrustments of NADN's property, the commercial reality was that the credit card purchases by NADN's customers initiated a complicated series of unsecured obligations among NADN, its customers, its customers' bank, Optimal, and the various banks and merchants that Optimal contracted with to deliver services to NADN. At no time in this series of events did NADN or the estate have title—legal, equitable or otherwise—to money or other funds paid by its customers. To the extent that the Trustee's claims are based on such a title notion, they are dismissed.

### b. Turnover of a Disputed Debt Under Section 542(b)

Optimal's victory on the title issue, however, does not conclude the matter. While payment of funds to a person to secure services for a third person might

---

The relation between a bank and its depositors is that of debtor and creditor. There can be no doubt of this proposition. Money deposited in a bank becomes part of its *general assets, and the bank simply becomes a debtor of the depositor.* The absolute title to the money by the mere act of deposit passes to the bank.

*McStay Supply Co. v. John S. Cook & Co.,* 35 Nev. 284, 297, 132 P. 545 (1912). This position is the majority position in the United States. *See, e.g., New York County Nat'l Bank v. Massey,* 192 U.S. 138, 147–49, 24 S.Ct. 199, 48 L.Ed. 380 (1904); *United States v. Banco Cafetero Panama,* 797 F.2d 1154, 1158 (2d Cir.1986). *See also* RESTATEMENT (SECOND) OF TRUSTS § 12, cmt. *l* (1959) ("A general deposit of money in a commercial bank does not create a trust, but a relation of debtor and creditor . . . .").

**11.** This relationship is explicitly recognized in the United States by Article 9 of the Uniform Commercial Code. *See* U.C.C. § 9–104 (2000) (detailing the methods by which a secured party may perfect an interest in a deposit

account). It is also recognized outside the area of recoupment by Section 506(a) of the Bankruptcy Code: "[a]n allowed claim of a creditor . . . that is subject to setoff under section 553 of this title, is a secured claim . . . to the extent of the amount subject to setoff . . . ."

**12.** The court acknowledges that Optimal's status as a non-bank takes this case somewhat out of the normal setting. Typically, Optimal's role is taken by a bank, and the issues of the accounts into which money flows are issues of bank deposit accounts, not issues of recoupment of nonbank obligations. For a resolution of a similar dispute in nonbankruptcy settings in which Optimal's role was taken by a bank, *see, e.g., First United Bank v. Philmont Corp.,* 533 So.2d 449 (Miss.1988); for similar cases in a bankruptcy setting, *see, e.g., Equitable Bank of Littleton, N.A. v. Jobin (In re Twenty–Four Hour Nautilus Swim & Fitness Ctr., Inc.),* 81 B.R. 71 (D.Colo.1987); *In re Standard Fin. Management Corp.,* 94 B.R. 231 (Bankr.D.Mass.1988) and the cases cited on page 13 above.

vest title to the funds in the payee (a property rights notion), it does not relieve the payee from any obligations thereby created (a personal obligation notion). And under federal bankruptcy law, Section 542 provides that even a personal obligation may sometimes be subject to a turnover action. This is shown by Bankruptcy Code § 542(b), which provides in pertinent part:

[A]n entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

In *Coppa v. Security Bank of Nevada (In re Taylor Motors)*, 60 B.R. 760, 762 (Bankr.D.Nev.1986), for example, Judge Jones held that a dealer reserve account, an account that is similar in many ways to the asset at issue here, was property of the estate subject to Section 542, but only after an examination of the prepetition contract that created the account, and whether it created a matured debt that was payable on demand or order. *See also Marshall v. Shipman Elevator Co. (In re Marshall)*, 240 B.R. 302, 305 (Bankr. S.D.Ill.1999) (unused storage charges are property of the estate subject to turnover, even if amount owed was created pursuant to oral contract).

Here, the Trustee can prevail if it can show the debt owed to NADN fits within Section 542(b). Can it?

Section 542(b) requires for turnover that the amounts payable must be "matured, payable on demand, or payable on order." Settled and controlling law holds that the presence of an active dispute over the amount owed takes the action out of the turnover area; one cannot shortcut a breach of contract action with a turnover demand. *MCI Telecommunications Corp. v. Gurga (In re Gurga)*, 176 B.R. 196, 199 (9th Cir. BAP 1994) ("turnover proceedings involve return of *undisputed* funds. . . . Here, the amounts, if any, owed to Source by MCI are in dispute and this dispute rests on breach of contract issues. . . . Breach of contract actions are noncore claims.") (emphasis in original). *See also Savage & Associates, P.C., v. Mandl (In re Teligent, Inc.)*, 325 B.R. 134, 137–38 (Bankr.S.D.N.Y.2005) ("well-settled law . . . that § 542(b) cannot be used to recover a disputed pre-petition debt"); *Hirsch v. London S.S. Owners' Mut. Life Ins. Ass'n Ltd. (In re Seatrain Lines, Inc.)*, 198 B.R. 45, 50 n. 7 (S.D.N.Y.1996) ("It is settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute."); *J.T. Moran Fin. Corp. v. American Consol. Fin. Corp. (In re J.T. Moran Fin. Corp.)*, 124 B.R. 931, 938 (S.D.N.Y.1991)("Where, as here, the court must resolve whether or not the debt claimed is due, the action to collect the disputed funds cannot be regarded as a turnover proceeding under the core jurisdiction of the bankruptcy court.")(report and recommendation of Schwartzberg, B.J.).

Here, as shown by the papers filed by both sides, there is a substantial and significant dispute over what is owed under the Agreement. Indeed, the Trustee's claim for relief seeking an accounting essentially concedes that an active and complex dispute exists over the amounts owed (if any) from Optimal to the estate. This dispute deprives the Trustee of the option of proceeding by turnover, and Optimal's request for a dismissal of that claim for relief is granted.

#### c. Post–Petition Transfers

Optimal also disputes the Trustee's second claim for relief. This claim alleges

that "[e]ach transfer of money from [NADN] to [Optimal] as hereinabove alleged, from and after June 11, 2003 [the date NADN commenced its case] is avoidable because each such transfer occurred after the commencement of the case and was not authorized under the Bankruptcy Code or by this court." This allegation, although not denominated as such, seeks to avoid these transactions under Section 549 of the Bankruptcy Code.[13]

Optimal's main objection is that "transfers" alleged to be made postpetition were really made prepetition. As strange as that sentence may seem, there is more than a modicum of sense in it. Optimal contends that any transactions flowing from obligations and agreements documented prepetition should be characterized as prepetition transactions. More particularly, it contends that its claims against NADN (at least to the extent they related to chargeback and penalties assessed postpetition) should be categorized as contingent at the time of NADN's filing, crystalizing into liquidated and mature claims at such time as Optimal acted on them. To complete the argument, Optimal argues that if the result is a prepetition claim, then the actions which lead to that claim must also be categorized as prepetition.[14]

This argument confuses the characterization of a prepetition claim with the existence of a postpetition transfer. Optimal's obligations to NADN may very well have been contingent claims at the commencement of the case. That characterization is a function of the breadth of Section 101(5) and its definition of claim.[15] But the definition of transfer is also quite broad. Under the Code,

> "transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption;

11 U.S.C. § 101(54).

As a consequence of the breadth of these two definitions, a post-petition transfer can transform a contingent prepetition claim into a fixed prepetition claim. This often happens when a debtor has had its debts guaranteed prepetition: when the guarantor pays on the guaranty

---

13. The allegation as it stands may be true, but only in the most trivial of senses. The complaint alleges transfers of only "money." It does not categorize any other type of transfer, such as by check or by electronic funds transfer (which are the subject of the other paragraphs of the complaint that the Trustee incorporates into his second claim for relief). Thus, as it stands without amendment, the complaint would pick up transfers of currency between NADN and Optimal. The amount of such currency transactions—in which representatives of Optimal and NADN would have to meet to exchange cash—are likely small (or even zero), and certainly would not be ordinary course under the Agreement. Given the nature of the allegations incorporated into the second claim for relief, and the unlikely nature of transactions literally described, the court assumes that the Trustee intended to pick up more, and thus the rest of this section analyzes the allegation as if it referred to the more generic term "funds."

14. Optimal makes these claim apparently because it believes that if the transfers are deemed to be made prepetition, then Section 549 cannot be used to avoid them.

15. A claim is any "(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured;"

postpetition, that payment transforms the guarantor's contingent reimbursement claim against the debtor into a fixed claim in the amount paid. The fact that the transfer relates to a prepetition transaction, however, does not alter its character as a postpetition event. Indeed, in those cases in which the nature of chargeback and other adjustments were at issue, courts have not hesitated to categorize the actions taken as postpetition transfers, subject to scrutiny under Section 549. *See, e.g., Health Sci. Products, Inc. v. AmSouth Bank, N.A. (In re Health Sci. Products, Inc.)*, 181 B.R. 121, 124 n. 2 (Bankr. N.D.Ala.1994); *Moratzka v. Visa, U.S.A. (In re Calstar, Inc.)*, 159 B.R. 247, 252–53 (Bankr.D.Minn.1993).[16]

As a consequence, the postpetition transactions may have been in relation to a prepetition event, but because they physically occurred postpetition, they are appropriately categorized as postpetition transfers subject to attack under Section 549.

In addition, to the extent the Trustee alleges that there was no contractual basis for the transfers—as in the Trustee's allegations that the chargebacks and fines were not permitted under the Agreement—the transfers lose any claim to prepetition categorization, since unauthorized transfers would be nothing more than a simple breach of contract (or, in egregious situations, conversion).

 Much of this sparing over characterization, however, seems unnecessary. Optimal essentially argues that everything it did was in the nature of recoupment. "Recoupment ... involves a

netting out of debt arising from a single transaction.... In recoupment, the elements of the debt may arise either before or after the commencement of the case." *Oregon v. Harmon (In re Harmon)*, 188 B.R. 421, 425 (9th Cir. BAP 1995). "[Recoupment] is applied when there are countervailing claims arising from the same transaction strictly for the purpose of abatement or reduction ... [and] provides for the adjudication of the just apportionment of liability relative to a dispute regarding a singular transaction." *In re Delicruz*, 300 B.R. 669, 680 (Bankr. E.D.Mich.2003), *quoting In re Harmon*, 188 B.R. at 425. *See also* David G. Epstein & Jonathan A. Nockels, *Recoupment: Apples, Oranges and Fruit Basket Turnover*, 58 SMUL. REV. 51 (2005).

 When it does apply, "[r]ecoupment is in the nature of a defense, the purpose of which is to do justice viewing one transaction as a whole." *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 146 (2d Cir.2002), *quoting Malinowski v. N.Y. State Dep't of Labor (In re Malinowski)*, 156 F.3d 131, 133 (2d Cir.1998), *in turn quoting United Structures v. G.R.G. Eng'g*, 9 F.3d 996, 999 (1st Cir. 1993). The party alleging a right of recoupment, "has the burden of proving the applicability of the doctrine of recoupment by a preponderance of the evidence." *In re Delicruz*, 300 B.R. at 680.

 Optimal contends that any modification of debits and credits accomplished postpetition were simply netting the amounts owed between NADN and Optimal. Such postpetition recoupment, as so

---

16. *Sherman v. First City Bank (In re United Sciences of Am., Inc.)*, 893 F.2d 720 (5th Cir. 1990) is not apposite, as there the court analyzed the credit card relationship as a series of independent transactions knit together by the law of setoff, rather than the interconnected netting of obligations owed by each party to the other governed by the law of recoupment. To the extent that Optimal relies on *United Sciences* and its setoff theory, then each postpetition transaction—that is, each chargeback or penalty assessed—was a setoff and violated the automatic stay. 11 U.S.C. § 362(a)(7).

characterized, has been permitted without relief from the stay in the face of a challenge by a trustee, especially in the area of health care reimbursements where, as here, there are numerous and significant payments and credits over the life of a contract. *Holyoke Nursing Home, Inc. v. Health Care Fin. Admin. (In re Holyoke Nursing Home, Inc.)*, 372 F.3d 1 (1st Cir. 2004); *Sims v. United States Dep't of Health & Human Services (In re TLC Hospitals, Inc.)*, 224 F.3d 1008 (9th Cir. 2000); *Slater Health Ctr., Inc. v. United States (In re Slater Health Ctr., Inc.)*, 306 B.R. 20 (D.R.I.2004), *aff'd*, 398 F.3d 98 (1st Cir.2005). As *Collier* summarizes, "[r]ecoupment often arises in contract cases, [and] ... although the courts are split on the issue, the better view is that the automatic stay does not apply to bar or restrain a legitimate right of recoupment because, properly construed, recoupment applies to define the obligation in question, rather than establish or enforce a separate debt." 5 COLLIER ON BANKRUPTCY ¶ 553.10 (15th ed. rev., 2005).

 But Optimal wants more than just *post hoc* validation of its recoupment. It wants a legal determination that its recoupments were appropriate, and were accomplished prepetition. At this stage it cannot prevail; as set forth above, it bears the burden of proof on its ability to recoup, and if such ability exists, the nature and extent of its recoupment. *In re Delicruz*, 300 B.R. at 680. While it has introduced extensive spreadsheets of its claims, much of the information is redacted or otherwise obscured so that neither the Trustee nor the court can determine anything other than it is numerically consistent. Moreover, to the extent that Optimal alleges

that NADN and the estate agreed to indemnify it for various chargebacks and penalties, it has failed to show adequately, by a preponderance of the evidence or otherwise, the basis of such indemnification, and the legitimacy of the charges that lead to the indemnification.

But whether these claims are prepetition or postpetition is somewhat of a red herring. They all related to what can and cannot be done within the bounds of the Agreement, and those issues are squarely addressed in the Trustee's breach of contract claim for relief.

d. **Requiring the Trustee to First Establish the Invalidity of a Transfer to OPL Before Seeking Recovery of the Object of the Invalid Transfer From Any Mediate Transferee From OPL**

Optimal contends that all claims against OPI under Section 550 are premature, in that no transfer has yet been avoided, or even found avoidable.[17] The complaint, however, alleges that OPI "received from [OPL] funds which [OPL] received from [NADN] and which funds are property of [NADN's] estate." Complaint, ¶ 16.f. *See also* Complaint, ¶ 27. Given the Trustee's allegations regarding the voidability of transfers from NADN to OPL, this language would seem to fit within the Codes concept of a "mediate transferee" of property that was involved in an avoidable transfer. 11 U.S.C. § 550(a)(2). If proved, OPI would thus be liable to return the property or, as is more likely here, its value. *Id.*

 Mediate transferees such as OPI have more defenses than "immediate" transferees such as OPL. Mediate trans-

---

17. Optimal seeks dismissal of the fraudulent transfer claims against both OPL and OPI, but its timing argument only applies to OPI. As a consequence, Optimal has made no argu-

ment that the fraudulent transfer claim for relief should be dismissed as to OPL, and thus that part of Optimal's motion which seeks such relief is denied.

ferees, for example, have a defense if they took: (1) for value; (2) in good faith; and (3) without knowledge of the voidability of the transfer. 11 U.S.C. § 550(b)(1). They also have a shelter defense; if a mediate transferee takes in good faith from another mediate transferee who had the protection of Section 550(b)(1), then each subsequent transferee who takes in good faith is sheltered by its transferor's status, even if the transferee did not take for value or took with knowledge that /the initial transfer was voidable. 11 U.S.C. § 550(b)(2).

■ The Trustee's allegations state that OPI "knew or should have known that [the funds it received from OPL were] property of the Debtor's estate and that its receipt of such funds subjected it to an order requiring it to turnover such funds to the trustee." Complaint, ¶ 16.f. Together with proof that the transfers that led to the transfers to OPI should be avoided, a case under Section 550(b)(1) has been adequately pled.

■ Optimal, however, argues that the Trustee must first actually obtain avoidance of the initial transfers to OPL. It points to the language of Section 550(a) itself, which provides that avoidance as to a mediate transferee such as OPI can only occur "to the extent that a transfer is avoided ..." Since the statute uses the past participle "avoided," Optimal argues that logically there must be avoidance of the transfers from NADN to OPL that led

to the transfers from OPL to OPI that the Trustee seeks to recover.[18]

Several courts have adopted this view. *Weinman v. Simons (In re Slack–Horner Foundries Co.)*, 971 F.2d 577 (10th Cir. 1992); *Williams v. Mortillaro (In re Resource, Recycling & Remediation, Inc.)*, 314 B.R. 62 (Bankr.W.D.Pa.2004); *Greenwald v. Latham & Watkins (In re Trans–End Technology, Inc.)*, 230 B.R. 101 (Bankr.N.D.Ohio 1998).

As recently noted by the Eleventh Circuit, however, this:

strict interpretation of § 550(a) produces a harsh and inflexible result that runs counterintuitive to the nature of avoidance actions. If the initial transaction must be avoided in the first instance, then any streetwise transferee would simply re-transfer the money or asset in order to escape liability. The chain of transfers would be endless.

*IBT Int'l, Inc. v. Northern (In re Int'l Admin. Serv., Inc.)*, 408 F.3d 689, 704 (11th Cir.2005). There is no controlling law in the Ninth Circuit, but what law there is in the Ninth Circuit favors the Trustee's position. *See Kendall v. Sorani (In re Richmond Produce Co., Inc.)*, 195 B.R. 455, 463 (N.D.Cal.1996) (finding that "once the trustee proves that a transfer is avoidable ... he may seek to recover against any transferee, initial or immediate, or an entity for whose benefit the transfer is made"). *See also Imperial Corp. of America v. Shields*, 1997 WL 808628, at *3 (S.D.Cal.1997); *Advanced*

---

**18.** Not all courts read "avoided" in the past tense. As Judge Lief Clark has put it:

The effect of the qualifying phrase "to the extent that a transfer is avoided" is "that liability is not imposed on a transferee to the extent that a transferee is protected under a provision such as section 548(c)." 124 Cong Rec H11097 (daily ed. Sept. 28, 1978); S17414 (daily ed. Oct. 6, 1978); (remarks of Rep. Edwards and Sen. DeConcini). This suggests that "avoided" in

§ 550 is not in the past tense, but instead the present perfect. That is, § 550 does not require that the transfer be avoided in a temporally antecedent and separate procedure, but simply recognizes the limitations placed on recovery by the safe harbors for certain transfers found in provisions such as § 548(c).

*Crafts Plus +, Inc. v. Foothill Capital Corp. (In re Crafts Plus+, Inc.)*, 220 B.R. 331, 335 (Bankr.W.D.Tex.1998).

Telecomm. Network, Inc. v. Allen (In re Advanced Telecomm. Network, Inc.), 321 B.R. 308, 328 (Bankr.M.D.Fla.2005).

The analyses in Int'l Admin. Serv. and Richmond Produce have the edge here. As noted by the Eleventh Circuit, in quoting Richmond Produce:

> An interpretation of Section 550 mandating actual avoidance of initial transfers, "conflates Chapter 11's avoidance and recovery sections." Richmond Produce further clarified that the language "to the extent that" simply appreciates "that transfers sometimes may be avoided only in part, and that only the avoided portion of a transfer is recoverable." … The Richmond Produce court then looked to the legislative history of Section 550 to explain the operative language. The court observed that Congress took "to the extent" to mean that "liability is not imposed on a transferee to the extent that a transferee is protected under a provision … which grants a good faith transferee for value of the transfer that is avoided only as a fraudulent transfer, a lien on the property transferred to the extent of value given." 124 Cong. Rec. H11,097 (Sept. 28, 1978), S17,414 (Oct. 6, 1978).

Int'l Admin. Serv., 408 F.3d at 706. The court adopts the holding of Int'l Admin. Serv., and will deny Optimal's request to dismiss OPI on those grounds.

### e. Genuine Issues of Material Fact Preclude Summary Judgment on the Trustee's Breach of Contract Claim Against OPL [19]

Optimal contends that everything it has done is in accord with the Agreement, and that the Trustee has not effectively rebutted its assertions. While Optimal has put forward a great deal of evidence, their argument still resolves itself into a form of self-approval: their interpretation of the Agreement is correct, and their actions were in accord with that interpretation.

At this stage of the case, before an answer has been made, such assertions are somewhat empty. Rule 56(c) of the Federal Rules of Civil Procedure, made applicable here by Rule 7056 of the Federal Rules of Bankruptcy Procedure, provides that summary judgment:

> [S]hall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

"The moving party bears the initial responsibility of informing the [trial] court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Hughes v. United States, 953 F.2d 531, 541 (9th Cir.1992) citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When considering a motion for summary judgment, a court may not weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all

---

19. As a consequence of the court's ruling on the unavailability of turnover, its jurisdiction for the common law breach of contract claim count would appear to be noncore. In re Gurga, 176 B.R. at 199 (9th Cir. BAP 1994) ("Breach of contract actions are noncore claims."). As neither party has objected to this court hearing the motion, and especially because Optimal requested it, the parties have consented to the entry of a final order disposing of Optimal's summary judgment motion as to this count.

justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Especially at this early stage, before an answer is even filed, "[t]here is another important dimension to summary judgment practice: motions for summary judgment must be decided on the record as it stands, not on litigants' visions of what the facts might some day reveal..., '[b]rash conjecture, coupled with earnest hope that something concrete will eventually materialize, is insufficient to block summary judgment.'" *Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 581 (1st Cir. 1994) (citation omitted).

██ A review of the facts, in the light most favorable to NADN and the estate (as the court must at this stage), demonstrates that ample issues of fact and interpretation remain. As further background, the complaint alleges that NADN and SF (which later became OPL) contracted in 2002 for Optimal to handle NADN's credit card transactions. The Agreement required NADN to pay a security deposit, and allowed Optimal to withhold a percentage of the money it received from NADN's credit-card customers in a reserve account to cover chargebacks and "any liabilities owed [to Optimal] or reasonably anticipated to be owed to it." Section 4.4.

Contrary to Optimal's implications, the Agreement in no way states or implies that the *value* represented by the reserve account belongs to Optimal forever for it to use as it wishes, or that Optimal has no other obligations to NADN. Rather, a reading of the entire Agreement makes clear that Optimal can use the money received from NADN's customer, or the val-

ue represented thereby, only to cover NADN's liabilities to Optimal under the Agreement. For example, the Agreement says that Optimal "shall have the right to withdraw from the Reserve Account any and all amounts *owed to it* hereunder without notice or demand." Section 4.8 (emphasis not in original). Section 4.9 also says that Optimal is entitled to interest that may accrue to the security deposit and reserve account.

The Agreement makes clear that the security deposit and the reserve account exist only to ensure that NADN had the wherewithal to pay the obligations it owed to Optimal under the Agreement. None of theses provisions effect a gift to Optimal, or a release of any other of NADN's claims against Optimal.[20] The intent and language of these provisions thus makes it clear that the reserve account's value is not Optimal's to apply without limit. But the Trustee alleges that Optimal has done just that, and Optimal has done little to dispel that notice. At a minimum this allegation gives rise to determine whose version is correct.

In addition, the Trustee also alleges that time periods under the Agreement permitting Optimal to retain funds have expired, and thus Optimal is liable to the estate for the amounts now owed. In particular, the Agreement states explicitly in two places that Optimal is only to hold the security deposit, reserve account, and "other amounts in the Client's account" for seven months after termination of the agreement (Sections 4.5 and 6.5). If Optimal's view is correct, these provisions would be odd surplusage—if the money was Optimal's to do with as it pleased all along, why provide for a timeline for its return?

---

**20.** Even if Optimal is right, the nature of such a transaction would have fraudulent transfer implications.

As NADN filed bankruptcy in June, 2003—more than two years ago—and as it has long since ceased operation, the seven-month waiting period has passed. From the language of the Agreement, it would seem that Optimal has no further claim to the money—leaving open and unaffected the Trustee's claim be paid this sum after the amount of disputed chargebacks and penalties are sorted out. Optimal's assertion in its Opening Memorandum that "[u]nder any reading of the Agreement, [NADN] has no interest in the Reserve Account (or the other sources of funds, for that matter) unless and until [Optimal] chose to release it" is thus flatly wrong. Thus, the plain language of these provisions clashes with Optimal's declarations and argument, thus exposing a genuine issue of material fact to be tried.[21]

### f. Accounting Claim for Relief is Moot

The Trustee alleges that Optimal assessed post-petition fines of $344,650, and assessed $97,325 in pre-petition fines. In this regard, the Trustee states in his opposition that Optimal is keeping these amounts "without any proper accounting for this money, without providing any proof that even a single one of the assessed chargebacks was proper, that a single fine was appropriately imposed, [and] without even showing that the Agreement provides for the imposition of fines."

The Trustee would seem to have all the legal tools it requires in its breach of contract claim. Yet it presses on with its claim for accounting. To understand Optimal's concern regarding this claim for relief, one must first understand the nature of the equitable nature of a civil action for an accounting.

The cause of action for an accounting is a restitutionary remedy. *See generally* 9 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2310 (1995); 1 DAN B. DOBBS, DOBBS LAW OF REMEDIES § 4.3(5) (1993); Joel Eichengrun, *Remedying the Remedy of Accounting*, 60 IND. L.J. 463 (1985). Its origins are ancient and in equity, where among other things it served the function of compelling fiduciaries to account to their beneficiaries for any profits derived from the use of property that "in equity and good conscience" belonged to the beneficiary. *See* DOBBS, *supra*, at § 4.3(5), at 609; 2 JOSEPH STORY, COMMENTARIES ON EQUITY JURISPRUDENCE §§ 441–529 (13th ed., Melvin M. Bigelow, ed., 1886).

This version of the accounting remedy retains vitality today. *See, e.g., Newby v. Enron Corp.*, 188 F.Supp.2d 684 (S.D.Tex.2002) (accounting for profits of securities fraud). This version is, however, unavailable in this action as there was no fiduciary relationship between NADN and Optimal;[22] their connection was noth-

**21.** There are also issues remaining regarding the appropriate construction of the Agreement with respect to the assessment of chargebacks and penalties. At oral argument, Optimal contended that the Agreement's provisions were in the nature of an indemnity, with NADN being responsible for all payments Optimal had to make to NADN's customers' banks, regardless of their validity; the Trustee obviously takes a different view. The various submissions by both parties with respect to one of the key provisions, Section

4.16, have not dispelled the doubts surrounding this issue, making summary judgment inappropriate.

**22.** In Section 8.3 of the Agreement, the parties acknowledge that the relationship between them is that of "independent contractors, and that nothing herein shall be construed so as to constitute [NADN] and [OPL] partners, representatives or joint venturers ...."

ing more than a simple business arrangement.[23]

Courts have extended the remedy of accounting to nonfiduciaries, however, in at least two circumstances. DOBBS, *supra* at § 4.3(5), at 611–12; Eichengrun, 60 IND. L.J. at 470–77. The first involves cases in which the dealings between the parties are so complex that an equitable master, and not a jury, is required to sort out the various dealings between the parties. Eichengrun, 60 IND. L.J. at 470–73; *see also Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*, 478 F.Supp. 889 (D.C.Pa. 1979), *vacated on other grounds*, 631 F.2d 1069 (3d Cir.1980).[24] This can occur both when the transactions arise out of several disparate dealings (and thus require the application of setoff), or when, as here, the transactions arise out of one transaction (and thus require the application of recoupment), yet are alleged to be so numerous and complex that only a equitable master may fairly sort them out.[25]

Optimal has moved to dismiss the equitable action because it holds no property of NADN's estate, and thus an action for an accounting is "improper" at this time. This raises squarely the issue of whether possession of the plaintiff's property is an essential element of an action of accounting between nonfiduciaries. On this point, the authorities are somewhat less precise, but appear to assume that the defendant's possession of property belonging to the complaining party is essential if the parties are not in a fiduciary relationship. *See* DOBBS, *supra*, at § 4.3(5), at 612 n. 25 (summarizing remedy in terms of property held); Eichengrun, 60 IND. L.J. at 478 (summarizing remedy in terms of profits gained from property received from the plaintiff, or from profits made from the use of the plaintiff's property); *id.* at 483 ("under traditional principles, no accounting is available" when the complaining party does not have "technical legal title to any property in the defendant's possession").

■ Against this background, one must keep in mind that as a restitutionary remedy, accounting does not yield a judgment for damages; rather, it seeks to restore to the plaintiff what is rightfully his or hers. *See* DOBBS, *supra*, at § 4.3(5), at 611 ("Accounting holds the defendant liable for his profits, not for damages."). It would seem significantly at odds with the theoretical and historical basis of the action of accounting to require an accounting from a party to a sophisticated commercial contract when the party called to account does not possess any of the complaining party's property, and when the contract itself specifies the monetary return each party expects.

---

23. The remedy of accounting was also used in equity to obtain access to discovery. Eichengrun, 60 IND. L.J. at 476–77. *See also* STORY, *supra*, § 551. This was necessary because before the merger of law and equity (which occurred in the federal court system in 1938), only equity could order discovery from any party since only equity acted *in personam*. WILLIAM BLACKSTONE, 3 COMMENTARIES *437 ("But, for what of this discovery at law, the courts of equity have acquired a concurrent jurisdiction with every other court in matters of account."). That basis for the action of accounting is no longer viable, since discovery beyond even the dreams of the most gen-

erous chancellor is now available in any civil action.

24. This obviously raises significant jury trial issues that are beyond the scope of this motion. WRIGHT & MILLER, *supra* at § 2310; 8 MOORE'S FEDERAL PRACTICE, at § 38.10[1].

25. The cases are collected in Eichengrun, 60 IND. L.J. at 475–76. Professor Eichengrun concludes, however, that "this [form of the accounting] remedy is now obsolete in federal courts .... [O]ne must conclude that this 'accounting' remedy no longer exists in the federal courts." *Id.* at 476.

■ It is a fundamental tenet that neither unjust enrichment nor restitution is available when, as here, the parties have completed performance under a contract which allocates their respective burdens and benefits. 3 DOBBS, *supra*, at § 12.7(5), at 179–80; E. ALLAN FARNSWORTH, CONTRACTS § 12.20, at 857–58 (3d ed.1999); RESTATEMENT (SECOND) CONTRACTS § 373(2) (1981) ("The injured party has no right to restitution if he has performed all of his duties under the contract and no performance by the other party remains due other than payment of a definite sum of money for that performance."). *Cf. John T. Brady & Co., v. City of Stamford*, 220 Conn. 432, 447–48, 599 A.2d 370, 377 (Conn.1991) ("After full performance of a contract, the appropriate measure of the value of the benefit conferred upon the party in breach is the value that the parties themselves, in their contract, have assigned to that performance ...."); RESTATEMENT (SECOND) OF CONTRACTS § 86, cmt. f (1981) ("By virtue of the policy of enforcing bargains, the enrichment of one party as a result of an unequal exchange is not regarded as unjust, and this Section has no application to a promise to pay or perform more or to accept less than is called for by a pre-existing bargain between the same parties.").

This rule makes sense when, as here, the parties have allocated the gains of a venture by means of a valid contract, and that contract provides the parties' own estimate of the value of their relative performances. Once that amount is determined by way of resolution of the Trustee's breach of contract claim, there will simply be no need to impose the equitable apparatus of an accounting to sort out who owes whom what. The breach of contract action thus suffices to grant the Trustee all appropriate relief, and thus the court grants Optimal's motion with respect to the first claim for relief.

### g. Lack of Privity as to OPI Precludes Claim for Accounting

Finally, OPI contends that its lack of privity with NADN renders it impervious to the Trustee's claim for an accounting. The complaint, which must be taken as true at this stage, alleges that OPI performed some necessary functions and tasks for OPL at times unspecified, and thus handled funds and amounts which, under the Agreement, should have been paid to NADN or the estate.

These allegations essentially frame OPI as a subagent of OPL. "A subagent is a person appointed by an agent empowered to do so, to perform functions undertaken by the agent for the principal, but for whose conduct the agent agrees with the principal to be primarily responsible." RESTATEMENT (SECOND) OF AGENCY § 5(1) (1958). *See also* RESTATEMENT (THIRD) OF AGENCY § 3.15 (T.D. No. 3, 2002). "Unless otherwise agreed, authority to appoint a subagent is inferred from authority to conduct a transaction for the principal for the performance of which the agent is to be responsible to the principal if: ... (b) the agent is a corporation, partnership or other organization." RESTATEMENT (SECOND) OF AGENCY § 80(b); *see also Doxsee Sea Clam Co. v. Brown*, 13 F.3d 550, 554 (2d Cir.1994); *Manley v. AmBase Corp.*, 121 F.Supp.2d 758, 772 (S.D.N.Y.2000).

■ As stated in the latest temporary draft of the *Third Restatement of Agency*, "[u]nless a principal has explicitly or implicitly directed the retention of a subagent, an agent who is hired by an agent to carry out the principal's work remains the hiring agent's agent alone." Reporter's Notes, RESTATEMENT (THIRD) OF AGENCY § 3.15 (T.D. No. 3, 2002), *citing Estate of Smith v. Underwood*, 127 N.C.App. 1, 487 S.E.2d 807, 815 (1997).

As a subagent hired without NADN's express or implicit authority, OPI was not in contractual privity with NADN, and thus may not be sued for breach of contract under the Agreement. Moreover, due to the lack of express or implicit authority, OPI was not NADN's, or the Trustee's, agent, so that there is no fiduciary duty upon which to base any claim for an accounting. RICHARD A. LORD, WILLISTON ON CONTRACTS § 54.15 (2005) ("By contrast, if an agent hires a subagent to carry out his or her principal's request without the principal's authorization to do so, the subagent is the agent of the primary agent only.").

As a consequence, if there is any liability for an accounting, it has to be based on those authorities holding nonfiduciaries liable for an accounting. *See, e.g.*, DOBBS, *supra*, § 4.3(5) at 612–13. But it has been stated that such actions are "obsolete in federal courts, [and thus] ... [O]ne must conclude that this 'accounting' remedy no longer exists in the federal courts." Eichengrun, 60 IND. L.J. at 476.

Moreover, to the extent that these cases were based upon unfair exploitation of the property of the person requesting an accounting, the predicate necessary for that action—property of the complaining party—is also absent here. *See, e.g.*, DOBBS, *supra*, at § 4.3(5), at 612 n. 25 (summarizing remedy in terms of property held); Eichengrun, 60 IND. L.J. at 478 (summarizing remedy in terms of profits gained from property received from the plaintiff, or from profits made from the use of the plaintiff's property); *id.* at 483 ("under traditional principles, no accounting is available" when the complaining party does not have "technical legal title to any property in the defendant's possession"). Neither OPL nor OPI held or holds property of the estate. This is sufficient to deny the request for any accounting for the subagent OPI.

Put another way, OPI should be able to take shelter from OPL's status as a party to the Agreement. Under the breach of contract action, NADN will get whatever it deserves from OPL under the Agreement. Beyond that result, neither NADN nor the estate have any right or expectation to recover profits from OPL's agent, OPI. The claim for relief for an accounting against OPI is therefore dismissed.

### Conclusion

OPL and OPI are subject to the jurisdiction of this court on the record thus developed. They must thus answer the complaint.

As to the substance, there is no dispute that the Trustee and OPL seriously dispute what the Agreement states and what, if anything, each owes the other. No matter how the various issues are presented or framed, that dispute is the core of this lawsuit. The Trustee has raised issues of interpretation and compliance by OPL that present genuine issues of material fact, and thus summary judgment on the claim for breach of contract is denied. Similarly, to the extent that the Trustee has alleged prepetition and postpetition transfers that were not authorized by the Agreement, he has stated a claim under Sections 548 and 549.

All other claims, however, will be dismissed. They essentially seek turnover, which is not available when the only property held by the nondebtor is a disputed debt, and an accounting, which is a an equitable remedy available only when the defendant holds estate property or when there is some sort of fiduciary duty owed.