NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY APPELLATE PANEL

OF THE NINTH CIRCUIT

In re:                          )      BAP No. SC-13-1304-JuKiKu
                                )      BAP No. SC-13-1464-JuKiKu
TREASURES, INC.,                )      (related)
                                )
                Debtor.         )      Bk. No. 12-06689-MM7
_____ )
APJL CONSULTING, LLC,           )
                                )
                Appellant,      )
                                )
v.                              )      M E M O R A N D U M*
                                )
TREASURES, INC.; LEONARD J.     )
ACKERMAN, Chapter 7 Trustee,    )
                                )
                Appellees.      )
_____ )

Argued and Submitted on January 22, 2015
at Pasadena, California

Filed - March 3, 2015

Appeal from the United States Bankruptcy Court
for the Southern District of California

Honorable Margaret M. Mann, Bankruptcy Judge, Presiding
_____

Appearances:   Jeremy W. Faith of Margulies Faith, LLP argued
               for appellant APJL Consulting, LLC; Dean T.
               Kirby, Jr. of Kirby & McGuinn argued for appellee
               Leonard J. Ackerman, Chapter 7 Trustee.
               _____

Before:  JURY, KIRSCHER, and KURTZ, Bankruptcy Judges.

_____

     * This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may
have (see Fed. R. App. P. 32.1), it has no precedential value.
See 9th Cir. BAP Rule 8024-1.

-1-

In BAP No. SC-13-1304, APJL Consulting, LLC (APJL) appeals from the bankruptcy court's order denying its compensation request for auctioneer services provided to Chapter 11[1] debtor, Treasures Inc., under a court-approved employment order (Compensation Order). For the reasons discussed below, we AFFIRM.

In BAP No. SC-13-1464, APJL appeals from the bankruptcy court's order finding APJL in contempt for willful violation of the automatic stay and award of damages (Damages Order). For the reasons discussed below, we AFFIRM the bankruptcy court's decision in all respects except for the award of actual damages in the amount of $68,598.49. We VACATE the award of actual damages and REMAND for further proceedings to determine the appropriate amount.

## I. FACTS

### A. The Parties

APJL is a Virginia based limited liability company. APJL and its related companies AP Consulting, LLC, and J&L Management Consultants, Inc., provide struggling furniture retailers with augmentation services by helping them acquire inventory when they have insufficient credit to do so. APJL would use its own credit lines to order furniture for its client/customers, assist with liquidation and going out of business sales, and provide personnel and consultation with the operation of such sales.

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and "Rule" references are to the Federal Rules of Bankruptcy Procedure.

-2-

APJL provided these services for set percentages on the sale proceeds and extension of credit. Allen A. Parvizian (Parvizian) is APJL's president.

Treasures, Inc. was a home furniture retailer with stores in San Diego and Irvine, California. By early 2011, debtor had fallen behind on numerous obligations, was subject to lawsuits and judgments, and was at risk of closing down.

**B.    The Prepetition Agreement Between APJL and Treasures, Inc.**

In July 2011, APJL and debtor entered into an agreement whereby APJL would assist debtor by providing augmentation services and consulting services, as well as conducting a "Closing of the Clearance Center" to raise funds, liquidate excess inventory, and improve debtor's financial condition. In the event this sale and "theme" did not achieve the objectives, APJL would conduct going out of business sales at debtor's San Diego store.

The agreement provided for APJL's augmentation services in several sections. Under ¶ 1(c), APJL agreed to, among other things, make available its contacts, credit lines and purchasing power to provide the going out of business sales with additional furniture and rugs (Additional Furniture) to be sold during the sale. APJL would order the Additional Furniture in debtor's name, but using its own credit lines. APJL charged a 3% fee (PMSI Fee) on all Additional Furniture based on invoice cost on any goods, material, or services that were placed on APJL's credit line.

Because debtor sold its own furniture inventory (Debtor's Furniture) in the sales along with the Additional Furniture, the

-3-

agreement contemplated that the sale proceeds generated from Debtor's Furniture would be segregated from the sale proceeds generated from the Additional Furniture.  As part of the segregation process, APJL used its own credit card machines for sales of the Additional Furniture so that proceeds generated from those sales went into an account designated by the parties as the augmentation account (Augmentation Account).

Paragraph 4 of the agreement provided for the establishment of the Augmentation Account:

> Consultant shall establish a bank account (Bank Account), which shall be controlled by Consultant. All proceeds from the Sale in relation to Additional Furniture shall be deposited into the Bank Account and distributed as provided under this Agreement.  All other proceeds in relation to the Company Inventory shall be deposited into the Company's bank account.[2]

The parties further agreed that APJL would make weekly distributions to debtor from the Augmentation Account according to the priorities set forth in ¶ 7 of the agreement:

> Provided that Consultant establishes the Bank Account, proceeds of the Sale shall be distributed on a weekly basis in the following order:  (i) first, to pay the Consultant Fee, (ii) second, if Additional Furniture is provided by Consultant to the Sale on a consignment basis, to pay for such Additional Furniture as it is sold and delivered; and if Additional Furniture is provided by Consultant other than on a consignment basis, to pay the invoice cost plus billed freight of such Additional Furniture, (iii) third, to pay for the PMSI Fee due to the Consultant, (iv) fourth, to pay back all monies advanced by the Consultant to the Sale, and (v) fifth, a draw from the Augment Account to the Company of 30% of all deposits during an Accounting Week; [and (vi)] sixth, the remainder to the Company.

---

[2] Debtor had its own separate bank account for the sale of its own furniture.  This account was not involved in the accounting dispute between the parties which is described below.

-4-

Essentially then, the Augmentation Account was to contain proceeds from the sale of the Additional Furniture from which would be paid APJL's 5% commission, its 3% PMSI fee, and certain expenses. After payment of the expenses, APJL would advance funds to debtor on a weekly basis from the remaining Additional Furniture proceeds — referred to as draws — which provided debtor with regular cash flow.

Although the draw was an advance to debtor on the profit for the Additional Furniture sales, each week the parties conducted an accounting to make sure sufficient cash remained in the account to cover the payment of APJL's commission and other expenses. The draw was set at 30% of deposits but mutually agreed upon adjustments occurred each week that altered the amount actually distributed to debtor.

The reconciliation process involved debtor's accounting supervisor, Ms. Butryn, sending a spreadsheet of debtor's sales and expense information to Parvizian. In turn, Parvizian would send a spreadsheet to Ms. Butryn that detailed the cumulative accounting information for all the income and expenses associated with the Augmentation Account. APJL's reconciliation sheet contained running totals from the beginning of the sale, through the end of the given week (Reconciliation Sheet). It was designed to account for all receipts and disbursements from the Augmentation Account as well as the amounts "due to" and "due from" the parties so the amount of the draw could be determined.

The expenses which reduced the amount of the weekly draw to debtor, included, among others: (1) advertising; (2) minor

store expenses; (3) delivery fees; (4) expense reimbursements; and (5) credit card chargebacks. APJL's 5% commission was also included in the Reconciliation Sheet and was paid directly from the Augmentation Account on a weekly basis. The Reconciliation Sheet further settled between the parties collected delivery fees and sales taxes on invoices issued by debtor.

Finally, adjustments were made to account for sales of Debtor's Furniture that were accidently charged on APJL's credit card machines and likewise to account for sales of Additional Furniture that were charged on debtor's credit card machines. Since debtor did not have an American Express account, APJL's American Express account was sometimes used to receive payments for Debtor's Furniture. Such amounts were applied and credited to the calculation of debtor's draw, less the fees charged by American Express. Once the parties agreed upon the figure, APJL would wire the draw amount to debtor's bank account.

During the course of the relationship, the cash flow from the sales was not sufficient to pay expenses and provide debtor with the necessary cash for payroll and advertising. As a result, Parvizian would occasionally defer deducting certain expenses.[3]

APJL opened the Augmentation Account at its bank in Virginia using its tax identification number, with a subtitle on the account of the store name, "Treasures Furniture San Diego." The address on the account was APJL's address in Virginia. APJL

---

[3] Due to APJL's decision to defer charging certain expenses, the weekly Reconciliation Sheet could not have reflected the actual contractual amounts owed between the parties.

took control over the account under the terms of the agreement.

Paragraph 6 of the agreement addressed the sales tax:

The Company shall solely be responsible for the payment of sales tax arising out of the Sale to applicable taxing authorities. If Consultant establishes the Bank Account, (a) Consultant shall forward to the Company the sales tax collected by Consultant, and the Company shall pay the sales tax to the applicable taxing authorities on a timely basis, and (b) from time to time, Consultant may, at the Company's request but at Consultant's sole and absolute discretion, provide the Company with an advance against moneys owed by Consultant to Company under the terms of this Agreement (the "Draw"); provided, however, that such Draw will be deemed first as an advance against sales tax collected by Consultant and due to Company and then the remaining as an advance against funds owed by Consultant to Company under the terms of this Agreement.

Finally, in ¶ 19, entitled Security Interest, debtor granted APJL a senior first priority security interest and lien in the Additional Furniture and their proceeds and all rights of [debtor] under the agreement, including, without limitation, amounts due or to become due to [debtor] under the terms of the agreement, all funds in the "Bank Account," and all the proceeds (including any insurance proceeds and credit card receivables).

**C.    Bankruptcy Events**

On May 8, 2012, debtor filed a voluntary chapter 11 petition. In Schedule B, debtor listed an account receivable owing from APJL in an amount to be determined. In Schedule G, debtor listed the agreement with APJL as an executory contract. Debtor's Schedules did not list the Augmentation Account as its personal property nor was APJL listed as a secured creditor in Schedule D.

There is no indication in the record that a final accounting of the Augmentation Account for the prepetition

-7-

period was performed before the petition was filed. Nor is it clear what the Augmentation Account balance was on the petition date. The parties simply continued to operate under the agreement as if there had been no bankruptcy filing, with APJL providing consultation and augmentation services to debtor and receiving payment for those services under the contract terms. Proceeds from the postpetition sales of Additional Furniture continued to be deposited into the Augmentation Account. The parties never sought approval for the arrangement from the bankruptcy court, although at various times in the record APJL and the court referred to the agreement as being "approved."[4]

In late June 2012, the Chief Restructuring Officer (CRO), James Emmitt, and debtor conducted a cost-benefit analysis of operations at the San Diego store and determined that it was in the best interests of the estate to close the store by the end of July 2012. Debtor reached an agreement with its landlord to surrender the premises and decided to conduct an auction of its equipment and furniture inventory during the period July 19 through July 25, 2012. Debtor requested APJL to act as auctioneer.

**1. The Court-Approved Auction And Employment Of APJL**

Although debtor did not think court approval of the auction was necessary because it thought the auction was ordinary

---

[4] In its September 10, 2013 Memorandum Decision, the bankruptcy court stated that its "earlier approval of the Agreement" did not relieve APJL from its obligation to turn over the funds when the dispute arose. We found no court approval of the agreement in the record. Rather, the bankruptcy court approved APJL's employment in connection with the postpetition auction based on different terms than those in the agreement.

-8-

course, debtor filed a motion to shorten time on its notice of intended action to auction property on July 18, 2012. The next day, debtor filed an ex parte application seeking bankruptcy court approval of the auction. In the application, debtor proposed using APJL as auctioneer under the terms set forth in an attached summary.

On July 20, 2012, the bankruptcy court granted debtor's motion to shorten time and scheduled a hearing on July 26, 2012. At the July 26, 2012 hearing, the bankruptcy court continued the matter to August 23, 2012, and required debtor to file a supplemental declaration explaining the circumstances as to how the emergency arose and provide information on the results of the auction.

On August 2, 2012, debtor filed a supplemental application seeking nunc pro tunc approval of the auction since the auction had concluded. Debtor explained that its portion of the net proceeds from the auction was approximately $70,000 which amounted to 40% of the gross proceeds generated from the sale.

At the August 23, 2012 hearing, the bankruptcy court orally granted debtor's request for approval of the auction. On the same day, debtor filed an application to employ APJL as the auctioneer nunc pro tunc. Parvizian filed a perfunctory "Declaration of Disinterest" in support, stating that "to the best of his knowledge," APJL did not have any connection with debtor "other than its liquidation and augmentation services" and did not represent any interest that was adverse to the estate.

The United States Trustee (UST) objected to the employment

-9-

application, contending that additional disclosures were required: specifically, APJL's connections with debtor, creditors or any other party in interest; the nature of APJL's relationship with debtor since July 2011; whether APJL was a creditor of debtor; whether APJL received payments from debtor since the filing of the bankruptcy; and the amount of payments debtor made to APJL one year preceding the bankruptcy. The UST also requested further information regarding APJL's affiliate, HFR Rugs, and arrangements regarding APJL's consignment of furniture for the auction.

Debtor responded by explaining APJL's augmentation services and disclosing that APJL had received $224,613.99 in commissions from the Augmentation Account since July 2011.

Parvizian filed a supplemental declaration on August 23, 2012, stating that as of the petition date, APJL was not a creditor of debtor, and that, "to the best of his knowledge" APJL had no interest adverse to debtor, its estate or creditors. Parvizian explained that APJL continued to provide debtor with augmentation and liquidation services since the petition date under the terms of the agreement and had received postpetition payments totaling $368,499.16 from all accounts. He also declared that prior to debtor's bankruptcy filing, APJL invoiced and received payment for all services it provided to debtor under the terms of the agreement (this statement would later come under scrutiny). Finally, Parvizian declared that the auction term sheet authorized APJL to supplement Debtor's Furniture with its own furniture, and with rugs provided by APJL's affiliate, HFR Rugs, and that APJL paid debtor a 10%

-10-

royalty on the gross sales for the consigned furniture and a 12% royalty on the gross sales for the HFR-consigned rugs.

The bankruptcy court entered the orders approving the auction and APJL's employment as the auctioneer nunc pro tunc on August 28, 2012.

About two weeks later, pursuant to the bankruptcy court's local rule 2002-2(a)(6), debtor filed a notice of intended action and opportunity for hearing seeking allowance of $37,649.34 in compensation for APJL's auctioneer services.

## 2. The Late September Reconciliation Dispute

By late September, debtor had closed its retail stores and was out of business. APJL performed an internal audit and reconciliation to determine where the parties stood under their agreement. Critical to the audit was a determination of the amount of profit that was available to debtor during its final weeks of operation.[5] The record shows that APJL deviated from its previous protocol and did not exchange information with debtor regarding the late September reconciliations or conduct the settle up discussions.[6]

According to APJL, the audit revealed that it had excluded

---

[5] From a final accounting perspective, if APJL had intentionally or inadvertently not included expenses in the previous reconciliations, theoretically the draws on the front end of the agreement could have been overfunded. Therefore, at the end of the agreement, debtor's draws would have to be reduced to account for those omitted expenses.

[6] Emmitt declared that APJL gave no notice to debtor nor did it receive debtor's consent before reducing the late September disbursements. There is nothing in the agreement that required such notice or consent, but that is how the parties had been operating up until this time.

-11-

$75,759 in credit card fees (CC Fees) and a $28,000 manager's salary (Manager's Salary) from the weekly Reconciliation Sheet calculations. Thus, APJL included the unaccounted for portion of the Manager's Salary, along with the CC Fees, in the Reconciliation Sheet for September 21, 2012 (September 21 Reconciliation). This resulted in an adjusted draw for debtor of $11,942.50, when debtor anticipated a draw closer to $110,000 which was based on a 40% gross sales figure.[7] Debtor asserted that APJL owed it an additional $99,000 for that week.

In the September 26, 2012 reconciliation (September 26 Reconciliation), debtor calculated it was entitled to $85,000 from gross proceeds, without any deduction for expenses. APJL had assessed charges against that amount resulting in a $36,601.04 net disbursement to debtor.

After receiving the September 21 Reconciliation, debtor requested a full reconciliation of the Augmentation Account and expressed concern over the sudden inclusion of the CC Fees and Manager's Salary. Debtor's counsel sent an email to APJL's corporate attorney, Jeffrey Wolf, on September 25, 2012, which states in relevant part:

> Treasures has ceased operations and is closing its retail stores. Treasures and APJL are currently in the process of completing the final accounting and reconciliation of the Treasures-APJL furniture transactions. APJL has recently provided transaction documentation to Treasures, which the Treasures CRO

---

[7] Under the agreement, debtor was entitled to draws of 30% of the net profit. However, Parvizian later orally agreed to deviate from the agreement and allow debtor draws of 40% of the net profit. This oral agreement, however, did not change the final sums which would be due debtor under the terms of the agreement.

-12-

team is in the process of reviewing.

As you may be aware, APJL manages a Treasure furniture-account bank account, which contains money that is property of the bankruptcy estate. It is in both parties' best interest to ensure the transparency, speed and accuracy of the final reconciliation process, as well as to protect property of the estate. Therefore, Treasures requests that all funds remain untouched in the bank account during the reconciliation process, and that APJL make no disbursements without Treasures' written consent until a final reconciliation is completed. Please confirm APJL's agreement to this arrangement, and thank you in advance for your cooperation.

On the same date, the CRO sent an email to Parvizian requesting Parvizian to seek written approval from him before making any disbursement from the account.

Having received no response from Mr. Wolf, debtor's counsel sent Mr. Wolf a follow-up letter on October 1, 2012 (October 1, 2012 Letter), which stated in relevant part:

Treasures had determined that . . . APJL . . . has not provided the proper reconciliation documentation, and more significantly, appears to have made approximately $99,000 of unauthorized and inappropriate debits from the Treasures-liquidation bank account.

Treasures demands that APJL provide no later than close of business tomorrow, October 2, 2012, (i) immediate delivery to Treasures of the requested QuickBooks reconciliation documentation flash drive, (ii) immediate freezing of the account with no disbursements made without written authorization from Treasures CRO, Mike Bergthold, which authorization will be granted for appropriate charges, and (iii) immediate payment to Treasures of $184,000, consisting of a $99,000 balance owed from the 9/20/12 weekly settlement and $85,000 owed from the 9/27/12 weekly settlements.

Please be advised that . . . failure to meet these demands constitutes willful violation of the automatic stay and conversion of the property of the estate, which is punishable by sanctions.

**3.     Debtor's Ex Parte Application For Order To Show Cause**

APJL did not comply with debtor's demands. Accordingly, on

-13-

November 2, 2012, debtor filed an ex parte application for order to show cause (OSC) why APJL should not be held in contempt for violating the automatic stay and ordered to disgorge funds. Debtor argued that the Augmentation Account contained property of the estate because the account was used for the deposit of gross proceeds from some sales held at debtor's Irvine and San Diego retail locations and was also used for the deposit of gross proceeds from the San Diego auction. Debtor further asserted that APJL owed it at least $184,000 ($99,000 + $85,000) for the last two September reconciliations and that there were unexplained transactions related to prepetition services.

> APJL has no right to unilaterally withdraw funds from the account without complying with the reconciliation process and resolving any disputed charges with the Debtor. Moreover, withdrawing funds from and cashing checks against the Augmentation Account for amounts allegedly owed to APJL on a pre-petition basis is also a willful violation of the automatic stay.

Debtor also alleged that APJL had wrongfully withheld certain funds for delivery fees in the amount of $10,822 and sales taxes in the amount of $56,098 which were collected and deposited into the Augmentation Account. Debtor argued that APJL was required to release these funds to it under ¶ 6 of the agreement.

In connection with APJL's compensation for auctioneer services, debtor asserted that APJL, as a prepetiton creditor, was not disinterested when its employment as auctioneer was approved by the bankruptcy court and APJL also failed to disclose its relationship with a related entity furniture company called Cameron Michael. Debtor alleged that APJL diverted hundreds of thousands of dollars from the Augmentation

-14-

Account to Cameron Michael.

Finally, debtor argued that $133,265 was in the Augmentation Account at the time it made the demand to freeze the account. Of that amount, $56,098 was collected for sales taxes and $10,822 was collected for delivery fees, which APJL refused to release to debtor, despite multiple demands to do so. Despite debtor's demand to freeze the account, APJL continued to cash checks and withdraw funds so that by the end of September 2012, the account balance was $88,840.20, and by the end of October 2012, the account balance was $48,395.19.

**4. Debtor Objects To APJL's Compensation As Auctioneer**

On October 15, 2012, debtor objected to its own notice of intended action regarding APJL's compensation for auctioneer services. Debtor essentially articulated the same problems it described in its ex parte application for an OSC and requested the bankruptcy court to order APJL to disgorge $37,649.34 in fees that APJL took as compensation for its auctioneer services.

APJL responded to the fee objection, asserting that debtor's contentions were false. APJL maintained that debtor did not own the Augmentation Account or APJL's Additional Furniture and was entitled to receive funds from the account only after the payment of all of APJL's expenses and overhead and the costs of goods and furniture. APJL also explained the reconciliation process for the September 21 Reconciliation and that it simply netted out the CC Fees and Manager's Salary that had been debited from the account since the beginning of the agreement. APJL stated that as to the September 26 Reconciliation, there were chargebacks, expense reimbursements,

fees, advertising reimbursements and other reimbursements that were due to APJL that were netted out. APJL characterized the fees as "administrative" in nature as part of the parties' on going relations and because of the way the agreement was structured. APJL stated again that it was not a creditor of debtor.

On October 29, 2012, Parvizian filed a declaration in support of the opposition (October 29, 2012 Declaration), which stated in part:

> Debtor ceased operations in September 2012, and APJL reviewed its accounts for the September settlements in order to account for fees and expenses that had not been credited to APJL. As such, when APJL reviewed the amount to be settled for September 21, 2012 (incorrectly stated as 20th), it netted out the credit card fees that the Bank Account was debited from the beginning of the Agreement. The credit card fees totaled approximately $75,759 and were never included in the Debtor's weekly settlement documentation or paid by Debtor. In addition, APJL paid for the office manager who worked the Sale and deducted it from the proceeds ($28,000) as the Agreement provides that all expenses that APJL incurs are to be netted out of proceeds.

The bankruptcy court set the hearings on the OSC and debtor's objection to APJL's compensation for November 29, 2012.

### 5. The November 29, 2012 Hearing

At the November hearing, the bankruptcy court decided that, based upon the language in the agreement and its understanding of the relationship between the parties, which the court characterized as a secured-creditor relationship, the monies in the Augmentation Account belonged to debtor.

The bankruptcy court also found that Parvizian willfully failed to disclose that APJL was a prepetition creditor in connection with APJL's employment application as auctioneer, and

-16-

that had the court known APJL would use postpetition proceeds to offset a prepetition obligation, it would never have approved APJL's employment. The court denied APJL's application for compensation based on its failure to disclose prepetition creditor status or relationships.

In addressing debtor's application for the OSC, the bankruptcy court found there was no factual dispute that the Augmentation Account contained property of the estate, which was subject to APJL's security interest.[8] Therefore, the court did not think an evidentiary hearing was warranted on the property of estate issue. The bankruptcy court found APJL's offset of prepetition expenses (i.e., the CC Fees and Manager's Salary) was an improper violation of the automatic stay. Finally, the court ordered APJL to turn over the $75,759 and $28,000 amounts related to its offset and if APJL did not comply the court would hold APJL in contempt.[9]

APJL's counsel requested the opportunity to submit a supplemental declaration prior to entry of an order on the OSC to clarify the CC Fees and Manager's Salary issue. The bankruptcy court granted the request and ordered debtor's counsel to lodge orders on the auctioneer fee application and

[8] As indicated below, APJL accepted the bankruptcy court's ruling that the funds in the Augmentation Account belonged to debtor and later adjusted Parvizian's description of the account as such.

[9] At the time the court ordered APJL to return the funds to the Augmentation Account, the court stated: "We need to restore the status quo so that the ownership of this account can be resolved." However, the bankruptcy court had already found that the funds in the account were property of the estate.

-17-

the OSC.

At the same hearing, the court considered debtor's motion to dismiss its chapter 11 case. Debtor's motion was mostly based on the fact that it had completed the orderly liquidation of its furniture inventory and ceased its retail operations at both the San Diego and Irvine retail stores. The bankruptcy court denied the motion and converted the case to one under chapter 7. On November 30, 2012, the case was converted and Leonard J. Ackerman was appointed the chapter 7 trustee (Trustee).

**6.    Post-Hearing Pleadings**

Trustee's counsel did not lodge the orders on the auctioneer fee application and the OSC until February 15, 2013. Debtor's counsel, Christine Baur, later explained that there was some confusion as to whether she or Trustee's counsel was supposed to lodge the orders after the case was converted.

APJL filed an objection to Trustee's proposed form of order on the OSC along with Parvizian's declaration regarding the return of funds to the Augmentation Account. In his February 22, 2013 declaration (February 22, 2013 Declaration), Parvizian stated in relevant part:

> As opposed to any reimbursement as alleged in the OSC, the CC Fees and Manager Salary were debited regularly throughout the Agreement from the Augmentation Account. . . .
>
> The [Manager Salary] was paid directly from the Debtor's Augmentation Account. . . .
>
> The CC Fees were also automatically debited from the Debtor's Augmentation Account by Global Pay on behalf of the credit card companies and by American Express on a monthly basis. . . . Again, these amounts were paid directly from the Debtor's Augmentation Account.

-18-

APJL never paid the CC Fees and was never reimbursed for such fees. . . .

Parvizian further declared that not all expenses were included in the weekly reconciliations and the draws did not account for all expenses paid through the Augmentation Account during the course of the relationship. Parvizian concluded that due to the netting out of mutual debts, APJL should not be required to return any amounts to debtor.

Attached to Parvizian's declaration were copies of the Augmentation Account bank statements from March 2012 to September 2012 which showed the amounts for the CC Fees and Manager's Salary debited from the account. Also attached was the itemization for the debits to the account for the Manager's Salary for the time period March 8 through September 23, 2012, and the itemization for the debits to the account for the CC Fees for the time period May through September 2012. These itemizations show that most of the debits occurred postpetition.

Thereafter, the bankruptcy court issued a scheduling order requiring APJL to explain the perceived "inconsistent positions" adopted by APJL and setting the matter for further hearing on March 28, 2013. The inconsistency arose because it was difficult to discern whether APJL paid the disputed charges and then reimbursed itself as indicated in Parvizian's October 29, 2012 Declaration or whether the disputed charges had been automatically debited from the account as indicated in Parvizian's February 22, 2013 Declaration.

On March 4, 2013, Parvizian submitted a declaration in response to the bankruptcy court's scheduling order. Parvizian

-19-

declared that his statements in the October 29, 2012 Declaration referred to an accounting of the funds for the September 2012 reconciliation of the Augmentation Account and not to any actual funds removed by APJL. At the time of that declaration, Parvizian testified that he believed the Augmentation Account belonged to APJL and, therefore, he referred to the payments as though they were made by APJL when they were made from the Augmentation Account. However, in the February 22, 2013 Declaration, Parvizian explained that he meant to show that the funds for the CC Fees and Manager's Salary were automatically deducted from the Augmentation Account each month. Recognizing that debtor owned the Augmentation Account, he no longer stated that APJL paid the expenses. Parvizian further declared that all debtor's expenses for the Additional Furniture, including the CC Fees and Manager's Salary, were paid regularly from the Augmentation Account and never reimbursed to APJL. Therefore, Parvizian again maintained that APJL owed debtor nothing under the agreement.

### 7. The March 28, 2013 Hearing

At the March 28, 2013 hearing, after considering the evidence presented by APJL, the bankruptcy court concluded that the deductions for the CC Fees and Manager's Salary were a "red herring" since those expenses had already been paid out of the Augmentation Account. The bankruptcy court concluded from the evidence that APJL had "double charged" the CC Fees and Manager's Salary since those monies had already been deducted from the Augmentation Account. The court further noted that the funds in the account belonged to debtor and that APJL failed to

-20-

release the funds when debtor requested. The bankruptcy court also observed that although APJL's justification for holding back payment to debtor was the overfunding of debtor's draws prior to the September reconciliations, it found no evidence in the record to support that argument. In the end, the bankruptcy court ordered APJL to restore funds in the amount of $100,000 (roughly the amount of the CC Fees and Manager's Salary) to the Augmentation Account so that an accounting could be done and the funds properly allocated through an adversary proceeding.

**8.    The April 12, 2013 OSC**

The bankruptcy court issued an OSC on April 2, 2013, which was amended on April 12, 2013, due to a typo. In the OSC, the court found that APJL was entrusted with control over property of the estate and APJL abused that trust by not accounting for the funds in the Augmentation Account and by giving incomplete and inconsistent explanations. The bankruptcy court ordered APJL to appear on May 2, 2013, to show cause why the court should not find APJL in contempt for its violation of the automatic stay and award damages to the estate.

The court also ordered APJL to (1) return the sum of $104,425.68 to the Augmentation Account for the CC Fees and the Manager's Salary, plus the unpaid sales taxes and delivery fees of $66,920.49 for a total of $171,346.17; (2) provide an accounting for its disposition of the funds in the Augmentation Account to the debtor; and (3) make no further dispositions from the Augmentation Account pending resolution of the accounting adversary proceeding which must be brought by Trustee within thirty days of its order.

-21-

In response to the OSC, Parvizian filed a declaration on April 25, 2013, regarding the distribution of funds from the account. Parvizian declared that APJL was never paid more than the amounts set forth in the court-approved[10] agreement, which amounts were fixed contracted amounts of a 5% consulting fee on gross sales of the debtor (less sales tax and delivery fees), a 3% fee for all services connected with the provision of the Additional Furniture, and reimbursement of certain expenses paid on an ongoing basis during the entire course of the relationship. Parvizian also declared that once he discovered that the CC Fees and Manager's Salary were not shown in the weekly reconciliations, he realized that there was not enough money in the Augmentation Account to pay debtor's draws in the amounts debtor thought were due. As a result of the inadvertence, debtor had been receiving too much in weekly draw payments by the exact amount of $98,551.25 which would have otherwise been deducted from the draw payments on a weekly basis during the life of the agreement. This overpayment on the draws, according to Parvizian, explained the shortfall as of September 2012.

Parvizian also attached a copy of debtor's reconciliation for the week ended September 21, which showed $69,477.82 due, and not the $110,000 originally requested. Further, Parvizian pointed out that the amount debtor claimed due for the September 26 Reconciliation was $22,122.65, an amount that was

_____

[10] As we noted earlier, despite the bankruptcy court's statements to the contrary, the agreement was never approved.

$14,478.50 less than the $36,601.04 payment made by APJL to debtor for the period. Parvizian declared that one possible explanation for the difference was that debtor had asked him to increase its draws to 40% as the business was winding down. Parvizian agreed to increase the draws because he had estimated, incorrectly, that there would be sufficient funds in the Augmentation Account to cover such payments.

Finally, Parvizian pointed out that ¶ 6 of the agreement stated that draw payments will be deemed first as an advance against sales tax collected by APJL and due to debtor and then the remaining as an advance against funds owed by APJL to debtor under the terms of the agreement. Parvizian explained that since the final draw payment exhausted the funds in the Augmentation Account, debtor should have set aside monies sufficient to cover any applicable sales tax and delivery fees.[11] Parvizian attached back-up material and explanatory spreadsheets for the period of September 1, 2012 to April 2013.

On May 1, 2013, Trustee filed a reply to Parvizian's declaration. Trustee asserted that he was not satisfied with the explanations and documents proffered by APJL. Therefore, Trustee stated that he would file an adversary proceeding by the deadline set by the court.[12] Trustee also pointed out that APJL

---

[11] The bankruptcy court later found that despite these provisions, the parties actually handled the sales taxes in a different manner. "APJL provided a weekly accounting of sales taxes collected and then Debtor provided an invoice to APJL for it to pay."

[12] Trustee filed the adversary proceeding on May 10, 2013,
(continued...)

-23-

had failed to comply with the court's OSC, which required it to immediately turn over the sum of $171,346. Next, Trustee asserted that payments in the amount of $183,219 were made to Cameron Michael, one of APJL's largest vendors, in September and October 2012. According to Trustee, APJL never disclosed the relationship between Cameron Michael and APJL in its employment application for auctioneer. Finally, Trustee argued that the September and October 2012 payments in the amount of $115,678 to HFR Rugs did not contain appropriate back-up, and therefore these amounts should be returned to the Augmentation Account until an accounting was provided.

### 9. The May 2, 2013 Hearing On The OSC

On April 30, 2013, the bankruptcy court issued a tentative ruling for the May 2, 2013 hearing on the OSC. The court noted that it required APJL to restore the disputed funds to the estate until the dispute was resolved and Trustee was obligated to commence an adversary proceeding by May 20, 2013, if he disputed APJL's accounting. The court also observed that there was no evidence before it regarding the damages sustained by the estate in dealing with the turnover order. The bankruptcy court continued the matter to May 30, 2013 to determine: (1) whether the chapter 7 trustee will file an adversary proceeding to account for the funds at issue in the OSC by May 10, 2013; (2) whether APJL had returned $171,346.17 to the Augmentation

---

[12](...continued) alleging claims for relief for turnover of and accounting for property of the estate under § 542; constructive trust; declaratory relief; avoidance and recovery of postpetition transfers and conversion.

-24-

Account as ordered by the court, and if not, why it has not complied with the court's order; (3) whether APJL had any excuse or justification for its inconsistent explanations for its actions taken in regard to the Augmentation Account; (4) whether APJL withdrew and failed to return the compensation for auctioneer services which the court declined to award; and (5) the amount of damages sustained by the estate for APJL's action in not turning over the funds to the estate since September 2012.

When the court issued its tentative ruling the order denying APJL's auctioneer compensation had not yet been entered.

On May 21, 2013, the bankruptcy court entered a Scheduling Order Re Order To Show Cause. The court ordered APJL to immediately turn over $171,346.17 to Trustee or his counsel to be held in counsel's client trust account pending further order of the court. The court continued the hearing on the OSC to June 13, 2013.

On May 24, 2013, the bankruptcy court entered an Order Implementing Order Dated 4/12/13. The bankruptcy court noted that it had ordered APJL to return $171,346 to the Augmentation Account on April 12, 2013. Trustee sought an order to allow those funds to be kept in a client trust account of his attorney. The court granted Trustee's request and ordered APJL to immediately turn over to Trustee or his counsel all funds in the Augmentation Account.

On May 28, 2013, APJL turned over to Trustee the amount of $27,958.58 which remained in the Augmentation Account.

**10. The June 10, 2013 Entry Of The Compensation Order**

On June 10, 2013, the bankruptcy court entered the order denying APJL compensation for its auctioneer services. The court also ordered Parvizian to file a declaration regarding the disbursement of funds from the auction by June 14, 2013, and ordered the funds disgorged and turned over to Trustee by June 17, 2013.

In his declaration, Parvizian declared that $37,649 in auctioneer fees were paid to APJL at the conclusion of the auction which took place at the end of August 2012 (the record shows the San Diego auction was complete by the end of July 2012.) Parvizian explained that APJL was never instructed that such fees could not be paid, and debtor did not request that such fees be held with debtor.[13] APJL stated that it would make its best efforts to return the fees by June 17, 2013.

APJL complied with the bankruptcy court's order and filed a timely appeal.

**11. The June 13, 2013 Hearing On The OSC**

On June 6, 2013, APJL filed a brief re OSC. There, APJL continued to assert that all the accounting issues needed to be resolved in the context of the adversary proceeding and that the orders relative to the $171,346 and associated attorney's fees should be stayed. APJL maintained that if it was compelled to

---

[13] This statement was contrary to the order employing APJL as auctioneer. The order provided that payment of APJL's compensation and reimbursement of expenses would be made only after it complied with local bankruptcy rule 6005 and notice to creditors. However, the employment order appears to have been entered after APJL had received payment for its services.

-26-

pay nearly $250,000, it would become insolvent.

APJL also explained that it did not return the $171,346 to the Augmentation Account since the CC Fees and Manager's Salary were paid directly to the creditors and thus any turnover of such funds should be made by the parties who received the monies. APJL again asserted that debtor received exactly what it was owed under the agreement and APJL did not double charge debtor for any fees, costs or taxes. APJL reiterated that under the agreement, debtor was to apply all draw payments to sales taxes first. APJL further maintained that the inconsistencies were previously explained in Parvizian's declaration filed on March 3, 2013. APJL stated that it had an "honest" misunderstanding of the nature of the Augmentation Account. Finally, APJL discussed its relationship with Cameron Michael and stated that Cameron Michael was not a creditor of debtor.

Parvizian submitted another declaration dated June 6, 2013. Parvizian mostly reiterated the explanation for the reconciliation process. He declared that APJL would occasionally defer deducting certain expenses because debtor did not have the necessary cash flow to support making payroll and paying for advertising. He explained that APJL had deferred deducting the Manager's Salary from debtor's draws to assist debtor with cash flow. Parvizian testified that other items also resulted in the overfunding of debtor's draws, including APJL's failure to include the CC Fees in its weekly settlement calculations. Finally, Parvizian declared that in no way did APJL wrongfully take funds from debtor.

Trustee filed a brief in support of the OSC on May 30,

-27-

2013. Trustee reported that he had filed an adversary proceeding against APJL and that APJL had not returned the $171,346 to the Augmentation Account nor had it returned the compensation the court declined to award.

Trustee requested damages of $29,000 in attorney's fees to remedy the violation of the stay and $13,112.50 connected with his attempt to obtain an accounting from APJL, preparing for the June 2013 hearing, and responding to APJL's supplemental briefing. The CRO requested fees of $15,662.50 and Christine Baur, attorney for debtor, requested $33,400.36 for the estate's pre-conversion attorney fees. The bankruptcy court issued a tentative ruling prior to the hearing finding that (1) the Augmentation Account was property of the estate, (2) APJL was obligated to seek relief from stay before undertaking unilateral offset, (3) APJL willfully violated the automatic stay, and (4) APJL violated the court's turnover order. The court ordered APJL to return $171,346 and for each day that it failed to do so, it would be assessed an additional fine of $250 per day.

At the hearing, the bankruptcy court essentially adopted its tentative ruling, but allowed APJL to submit further briefing on the issue why it was impossible for APJL to comply with the court's turnover order. The court took the matter under submission.

**12. Supplemental Briefing By APJL**

On July 17, 2013, APJL submitted a supplemental brief. There, APJL again provided an accounting, this time specifically with respect to the October 1, 2012 Letter in which debtor requested APJL to freeze the account. APJL identified numerous

-28-

third party checks that had been issued before October 1 in the amount of $25,582.66. APJL explained that had it "frozen" the account on October 2, 2012, all those checks would have been returned for insufficient funds to a total of nine different third-party vendors and service providers. APJL argued that the writing of bad checks could have subjected it to both civil and criminal liability in California, where the debtor is located, and in Virginia, where APJL is located. APJL asserted that it would not have been reasonable or prudent for APJL to have stopped payment or frozen the account as it pertained to such outstanding checks. APJL further noted that debtor had not challenged the validity of any of the expenses associated with the payments made by APJL after the October 1, 2012 Letter.

Finally, APJL argued that it was impossible for it to comply with the court's turnover order since the CC Fees had been collected by the credit card companies and the funds were not in its possession. Likewise, the Manager's Salary had also been withdrawn and those funds were not in its possession. Finally, APJL argued that a turnover motion could not be used as a shortcut for a breach of contract dispute under the holding in Leonard v. Optimal Payments Ltd. (In re Nat'l Audit Def. Network), 332 B.R. 896, 914-916 (Bankr. D. Nev. 2005).

**13.  The September 26, 2013 Entry Of The Damages Order**

On September 10, 2013, the bankruptcy court issued its memorandum decision and civil contempt order against APJL for failing to turn over property of the estate and to pay damages. The court found APJL in violation of the automatic stay and awarded attorney's fees in the amount of $77,240 and actual

-29-

damages in the sum of $68,598.49, for a total of $145,838.49.

In calculating the actual damages, the bankruptcy court used the time period from September 25, 2012 (the date debtor requested APJL to freeze the Augmentation Account) to October 1, 2012 (the date debtor informed APJL that it was in violation of the stay). According to the court, the balance in the Augmentation Account on October 1, 2012, was $116,702.74. Deposits after that date were made in the amount of $44,394.12. Therefore, the bankruptcy court found that the amount of $161,096.86 ($116,702.74 + $44,394.12) would have been preserved had APJL frozen the account.

Due to the fact APJL had paid debtor $36,601.04 on September 26, 2012, the bankruptcy court gave APJL credit for that amount. The court also gave APJL credit for the amount of $27,958.75[14] which it had turned over to Trustee on May 28, 2013. Therefore, the total credit given was $64,539.62,[15] to which the court added another credit of $27,958.75[16] leaving $68,598.49 unaccounted for ($161,096.86 - $64,539.62 - $27,958.75 = $68,598.49).

The order further provided that for each day that APJL refused to return $68,598.49 to Trustee, APJL would be assessed an additional fine of $100, plus additional attorney's fees

[14] We could not find this exact amount in the record. Trustee's brief in support of the OSC filed May 30, 2013, indicates that APJL turned over $27,948.58 to Trustee.

[15] Using the bankruptcy court's numbers, the amount of the credit actually was $64,559.79.

[16] It appears that the court gave APJL double credit for the $27,958.49 amount.

-30-

incurred in rectifying its continuing contumacious conduct. The bankruptcy court entered the Damages Order on September 26, 2013. APJL timely appealed.

## II. JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(E) and (O). We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

A. Whether the bankruptcy court erred by denying APJL compensation for its auctioneer services on the grounds that it was a prepetition creditor and therefore not "disinterested";

B. Whether the bankruptcy court erred in finding that the funds in the Augmentation Account were property of the estate;

C. Whether the bankruptcy court erred in finding that APJL had violated the automatic stay; and

D. Whether the bankruptcy court abused its discretion by awarding contempt damages for APJL's violation of the automatic stay without an evidentiary hearing.

## IV. STANDARDS OF REVIEW

The abuse of discretion standard is applied to our review of the bankruptcy court's award of attorney's fees, the court's decision not to hold an evidentiary hearing, and its finding of civil contempt and imposition of sanctions. Feder v. Lazar (In re Lazar), 83 F.3d 306, 308 (9th Cir. 1996) (attorney's fees); Murphy v. Schneider Nat'l, Inc., 362 F.3d 1133, 1139 (9th Cir. 2004) (evidentiary hearing); F.T.C. v. Affordable Media, LLC, 179 F.3d 1228, 1239 (9th Cir. 1999) (civil contempt and imposition of sanctions).

-31-

The bankruptcy court abuses its discretion when it fails to identify and apply "the correct legal rule to the relief requested," United States v. Hinkson, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc), or if its application of the correct legal standard was "(1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" Id. at 1262.

We review for clear error the bankruptcy court's findings of fact in connection with the civil contempt order. Affordable Media, LLC, 179 F.3d at 1239.

Whether property is property of the estate is a question of law reviewed de novo. Collect Access LLC v. Hernandez (In re Hernandez), 483 B.R. 713, 719 (9th Cir. BAP 2012). Similarly, the applicability of the automatic stay and exceptions thereto are questions of law that we consider de novo. Lockyer v. Mirant Corp., 398 F.3d 1098, 1107 (9th Cir. 2005). De novo means review is independent, with no deference given to the trial court's conclusion. Barclay v. Mackenzie (In re AFI Holding, Inc.), 525 F.3d 700, 702 (9th Cir. 2008).

## V. DISCUSSION

### A. The Compensation Order

The denial of APJL's compensation for its auctioneer services raises questions regarding APJL's disinterestedness, adverse interest to the estate, and adequacy of its disclosures. These issues are relevant to whether the bankruptcy court abused is discretion in denying APJL compensation for its auctioneer services.

Under § 327(a), a debtor in possession may employ a

-32-

professional with court approval only if (1) they are disinterested persons and (2) they do not hold or represent an interest adverse to the estate. See Tevis v. Wilke, Fleury, Hoffelt, Gould & Birney, LLP (In re Tevis), 347 B.R. 679, 687 (9th Cir. BAP 2006). The two tests overlap. Id.

A "disinterested person" is defined as one who "is not a creditor" and "does not have an interest materially adverse to the interest of the estate or of any class of creditors . . . by reason of any direct or indirect relationship to, connection with, or interest in, the debtor . . . or for any other reason." § 101(14)(A),(C). A creditor is defined as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." § 101(10)(A). A claim is defined as the "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." § 101(5)(A).

APJL's primary argument on appeal is that the bankruptcy court erroneously determined that it was a prepetition creditor of the bankruptcy estate and thus not disinterested. According to APJL, the error occurred because the bankruptcy court assumed that APJL had withdrawn and paid itself almost $100,000 in September 2012 to reimburse itself for the CC Fees and Manager's Salary. APJL asserts that the evidence shows those funds were debited directly from the Augmentation Account and thus APJL was not owed anything from debtor. APJL maintains it was not a prepetition creditor and therefore was a disinterested party.

We agree that APJL is not a prepetition creditor based upon

the automatic debits for the CC Fees and Manager's Salary from the Augmentation Account prepetition. APJL had no "right to payment" from debtor for these expenses when they were automatically debited from the account. However, APJL has asserted throughout this record that it overfunded draws to debtor because it did not take into account the CC Fees and Manager's Salary. The record shows that some of the CC Fees and Manager's Salary were debited from the Augmentation Account prepetition, but it is impossible to tell from this record whether APJL overfunded draws to debtor prepetition or whether the overfunding was limited to the postpetition period. If the draws were more than the expenses which were debited during the prepetition period, then it is possible APJL was owed money from debtor on the petition date. Most troubling is that APJL states that it was not a creditor even though it never conducted a final accounting as of the petition date that determined the rights and liabilities of the parties for the prepetition period.[17]

In any event, APJL overlooks that debtor granted APJL a security interest in the Additional Furniture and its proceeds under the terms of the agreement. Therefore, as of the petition

[17] Under the execution of the terms of the agreement described in Parvizian's declarations, a weekly reconciliation was done and checks issued to balance the account on Mondays for the period ending several days prior. Therefore, on any given Tuesday, APJL was owed money by debtor for transactions since the last reconciliation. The likelihood that APJL was owed money on the petition date — and therefore a creditor — was significant, even without taking into account that APJL was not factoring in all expenses when it gave draw checks to debtor.

date, APJL was a secured creditor and as the record shows, APJL continued to enforce its secured claims against debtor's funds in the Augmentation Account postpetition. APJL was thus not disinterested and failed to disclose its secured creditor status under the agreement in connection with its request for employment as auctioneer.

A professional may be disinterested if it does not have an "interest materially adverse to the interest of the estate . . . by reason of any direct or indirect relationship to, connection with, or interest in, the debtor . . . or for any other reason." § 101(14)(C). An "adverse interest" means "to possess or assert any economic interest that would tend to lessen the value of the bankrupt estate or that would create either an actual or potential dispute in which the estate is a rival claimant." In re Tevis, 347 B.R. at 687.

APJL had control of the Augmentation Account throughout the pre and postpetition relationship between the parties and offset pre and postpetition claims against debtor's postpetition draws. Moreover, during the postpetition period, APJL made payments from the account to entities that were insiders of APJL and those relationships were never disclosed in the context of its employment application. Further, since the parties continued to operate under the agreement postpetition, APJL was owed money on its commissions and reimbursement of other expenses on a recurring basis and therefore had postpetition creditor status. But this relationship was never disclosed.

The record shows that APJL clearly had an economic interest and connection to debtor under the terms of the agreement which

-35-

were adverse to debtor as borne out by the present dispute. These facts were relevant and material to the bankruptcy court's scrutiny of the relationship between APJL and debtor for purposes of accessing whether APJL held an adverse interest or conflict of interest. Yet, APJL never disclosed these facts to the bankruptcy court.

Rule 2014 provides that the employment application "shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest . . . ." The disclosure provisions of Rule 2014 are strictly applied with the burden on the applicant to come forward and make full, candid, and complete disclosure. Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park-Helena Corp.), 63 F.3d 877, 881 (9th Cir. 1995).

> Even a negligent or inadvertent failure to disclose fully relevant information may result in a denial of all requested fees. . . . The duty of professional is to disclose all connections with the debtor, debtor-in-possession, insiders, creditors, and parties in interest. . . . They cannot pick and choose which connections are irrelevant or trivial. . . . No matter how old the connection, no matter how trivial it appears, the professional seeking employment must disclose it. Id. at 882.

The record shows that APJL failed to meet the duty of full and complete disclosure. Whether its failure to disclose was willful or not is irrelevant to strict application of the disclosure rules.

A lack of disinterestedness does not mandate a denial of all compensation if the professional relies on the employment order. First Interstate Bank of Nev. v. CIC Inv. Corp.

-36-

(In re CIC Inv. Corp.), 192 B.R. 549, 553–54 (9th Cir. BAP 1996). In In re CIC Inv. Corp., the Panel held that the bankruptcy court had discretion to award compensation for services performed in reliance on the order authorizing employment, before that order was reversed on appeal. Unlike here, the professional in that case had "fully disclosed" its relevant connections and "all potential conflicts" at the outset. Furthermore, we cannot see how APJL relied upon the employment order for its compensation when the order was entered after the auction was complete and entered nunc pro tunc. In any event, APJL does not tell us how it relied upon the order approving its employment, which was entered after the fact.

In the end, the bankruptcy court has broad discretion in designing appropriate remedies to deal with violations of Rule 2014. In re Park-Helena, 63 F.3d at 882; see also In re Film Ventures Int'l, Inc., 75 B.R. 250, 253 (9th Cir. BAP 1987); § 328(c). Considering the record as a whole, we conclude the bankruptcy court did not abuse its discretion when denying APJL's compensation request; the court applied the proper legal standards and its application of those standards to the facts is supported by the record. We thus affirm the Compensation Order.

**B. The Damages Order**

The Damages Order involves the interplay between §§ 541, 542, 362, and 105(a).

**1. Property of the Estate**

"Property of the estate" is defined in § 541(a) as all of a debtor's legal or equitable interests in property, wherever located, as of the commencement of the case. "Any interest in

-37-

property that the estate acquires after the commencement of the case" is property of the chapter 11 estate. § 541(a)(7). While § 541 sets forth what interests of the debtor must be transferred to the bankruptcy estate, it does not address "'the threshold questions of the existence and scope of the debtor's interest in a given asset.'" Dumas v. Mantle (In re Mantle), 153 F.3d 1082, 1084 (9th Cir. 1998). Rather, the bankruptcy court must look to state property law to determine whether, and to what extent, the debtor has any legal or equitable interests in property as of the commencement of the case. Id. The party seeking to include property in the estate bears the burden of showing that the item is property of the estate. Seaver v. Klein-Swanson (In re Klein-Swanson), 488 B.R. 628, 633 (8th Cir. BAP 2013). Whether the proceeds in the Augmentation Account were property of the estate would necessarily preface the determination of whether a stay violation occurred.

Trustee argues on appeal that APJL conceded that the funds were property of the estate and thus the doctrines of judicial admission or judicial estoppel should apply. Judicial admission does not apply since APJL did not admit facts, but only adopted the legal conclusion by the bankruptcy court that the funds were property of the estate. Judicial estoppel "is an equitable doctrine invoked by a court at its discretion" and "is invoked to prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process." Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir. 1990). Since the bankruptcy court's decision that the funds in the Augmentation Account were

-38-

property of the estate is reviewed de novo, we fail to see how APJL's alleged inconsistent position on appeal would have an adverse impact on the judicial process.

APJL points to impermissible burden shifting as grounds for reversal. We do not discern any improper burden shifting and, as further discussed below, the agreement controlled the rights of the parties to the funds in the Augmentation Account. Once the bankruptcy court interpreted the agreement as a matter of law, the court still gave APJL an opportunity to refute the court's interpretation through other evidence, which it did not do.

The prepetition agreement between the parties controls the rights of the parties to the funds in the Augmentation Account that were generated from the postpetition sales of the Additional Furniture.[18] The interpretation of the agreement is governed by Virginia law. Under Virginia law, we review the bankruptcy court's interpretation of a contract de novo and "'have an equal opportunity to consider the words of the contract within the four corners of the instrument itself.'" Uniwest Constr., Inc. v. Amtech Elevator Servs., 699 S.E.2d 223, 229 (Va. 2010). We construe the contract as a whole, giving terms their ordinary meaning unless some other meaning is apparent from the context. Id. The various provisions are harmonized, giving effect to each when reasonably possible, and

---

[18] Since the proceeds due debtor from the court-approved auction were paid by APJL prior to this dispute, it does not appear that debtor is owed any money from the auction. Therefore, we attribute the funds in the account to the postpetition sales and not proceeds from the auction.

are construed considering the circumstances under which they were executed and the condition of the parties. Id.

"Contract language is ambiguous when it may be understood in more than one way or when it refers to two or more things at the same time. However, a contract is not ambiguous merely because the parties disagree as to the meaning of the terms used." Eure v. Norfolk Shipbuilding & Drydock Corp., 561 S.E.2d 663, 668 (Va. 2002). When a contract is ambiguous, the court will look to parol evidence to determine the intent of the parties. Id. at 667-68.

Relying on the language used by APJL and debtor in the agreement, the bankruptcy court found that the agreement was essentially a financing arrangement whereby APJL loaned money through its credit lines to debtor for the purpose of acquiring the Additional Furniture which was bought in debtor's name. The court did not find any provision that said anything about the account being "owned" by APJL, only that APJL had "control". Accordingly, the court concluded that the proceeds deposited into the Augmentation Account belonged to debtor, subject to APJL's security interest. Thus, it follows that the proceeds were property of the estate.

We agree with the bankruptcy court's assessment that the language in the agreement shows a financing arrangement and a creditor-debtor relationship. The agreement plainly states that debtor granted APJL a security interest in all the proceeds from the Additional Furniture and other rights it had under the agreement and that APJL would buy the Additional Furniture in debtor's name. Furthermore, although APJL's possession and

-40-

control of the account are indicia of ownership, its possession and control was necessary to perfect its security interest under Virginia law. See Va. Code § 8.9A-312(b)(1) (a security interest in a deposit account can only be perfected by control as defined in Va. Code § 8.9A-314); Va. Code § 8.9A-314 (perfection by control occurs when the secured party actually obtains actual control of the deposit account).

The agreement is not ambiguous about APJL's security interest in the proceeds from the Additional Furniture. As the bankruptcy court noted, it would be illogical for APJL to have a security interest in its own property. Likewise, it would be illogical for APJL to be paying its own expenses (such as the commissions) out of its own property.

On appeal, APJL focuses on the priority of the distributions under the agreement, pointing out that debtor was allowed to share in the sale proceeds only after the payment of expenses (among them the CC Fees and Manager's Salary as well as costs of goods sold and other expenses). Whether or not the distribution scheme was adhered to is a separate question from what constitutes property of debtor's estate.

APJL also argues on appeal that the Augmentation Account operated more like an escrow account and thus the funds were not property of the estate under the holding of Dzikowski v. NASD Regulation, Inc. (In re Scanlon), 239 F.3d 1195, 1998 n.6 (11 Cir. 2011) and Carlson v. Farmers Home Admin. (In re Newcomb), 744 F.2d 621, 626-27 (8th Cir. 1984). Because APJL raises the escrow argument for the first time on appeal, we do not need to consider it. O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert,

Inc.), 887 F.2d 955, 957 (9th Cir.1989). However, even if we did, APJL's escrow analogy is contrary to the language of the agreement. Accordingly, we affirm the bankruptcy court's decision that the funds in the Augmentation Account were property of debtor's estate.

## 2. Stay Violation

To assemble the bankruptcy estate, § 542 requires that, during bankruptcy proceedings, an entity "in possession, custody, or control" of certain property in the estate "shall deliver" that property to the trustee (subject to certain conditions not relevant here). § 542(a). While bankruptcy proceedings are pending, the automatic stay provisions of § 362 work with §§ 541 and 542 to shelter the debtor's estate from action by creditors, enabling the debtor to get the relief and fresh start that are among the goals of the bankruptcy regime. Thus, under § 362, filing a bankruptcy petition automatically effects a stay of "any act to obtain possession of property of the estate . . . or to exercise control over property of the estate." § 362(a)(3). Those who violate § 362 are liable for related damages and costs.

Since the funds in the Augmentation Account constituted estate property under § 541(a)(7), APJL was required to return the funds to debtor as soon as debtor notified it to return the property. Otherwise, it would be holding the funds in violation of the stay. See U.S. v. Whiting Pools, Inc., 462 U.S. 198, 206-07 (1983). The record shows that debtor notified APJL to pay the amount of $184,000 (which represented the $99,000 and $85,000 shortfalls for the late September reconciliations) in

-42-

the October 1, 2012 Letter and asserted that a stay violation would result if APJL failed to do so. The bankruptcy court found the October 1, 2012 Letter required APJL to "turn over the funds in the Augmentation Account under § 542 upon debtor's demand."

On appeal, APJL argues that the fundamental flaw in the bankruptcy court's finding is that the October 1, 2012 Letter never made a turnover request. Rather, according to APJL, the letter demanded that APJL "freeze" the account but that disbursements could be made with the CRO's written authorization. APJL further notes that in debtor's ex parte application for the OSC, debtor requested that APJL "disgorge" $184,000 as opposed to turnover.

We are not persuaded that these nuances change the outcome when considering the context of the letter as a whole. Debtor made a number of demands in the October 1, 2012 Letter, including requests for reconciliation documentation, freezing the account, and the immediate payment of $184,000. The letter also advised that failure to comply with these demands "constitutes willful violation of the stay and conversion of property of the estate which is punishable by sanctions." Importantly, by requesting the freezing of the account, limiting disbursements to those with written approval, and the return of $184,000, debtor sought to maintain the status quo, which is the purpose behind the automatic stay. See Hillis Motors, Inc. v. Haw. Auto. Dealers' Ass'n, 997 F.2d 581, 585 (9th Cir. 1993) (the automatic stay is designed to effect an immediate freeze of the status quo). "The stay requires the creditor to maintain

-43-

the status quo ante and to remediate acts taken in ignorance of the stay." Franchise Tax Bd. v. Roberts (In re Roberts), 175 B.R. 339, 345 (9th Cir. BAP 1994).

Regardless of whether debtor used the terminology "disgorge" or "turnover" later in the OSC, we conclude that the October 1, 2012 Letter was sufficient to put APJL on notice that its failure to freeze the account or its wrongful retention of funds would result in a violation of the automatic stay. Of course, APJL did not freeze the account nor did it seek written authorization from the CRO for any disbursements. It also never turned over any money to debtor. Had APJL re-established the status quo, its violation of the stay would have ended.[19]

APJL argues that by the time debtor demanded turnover of the $184,000, the expenses had already been disbursed to the credit card companies and the manager. The fact that APJL no longer had possession of the funds is irrelevant in a turnover analysis under § 542. Section 542(a) states in relevant part, "[A]n entity . . . in possession, custody, or control, **during the case**, of [property of the estate, or exempt property], shall deliver to the trustee, and account for, such property **or the value of such property**, unless such property is of inconsequential value or benefit to the estate." (Emphasis added). The Ninth Circuit has recently rejected the argument

---

[19] One consequence of APJL not freezing the account was chargebacks by the credit card companies which occurred after October 1, 2012. These chargebacks themselves may have been violations of the automatic stay, especially if they were for prepetition debits which is unclear from the record. Whether pre or postpetition, a credit card company must get relief from stay to charge back a debtor's merchant account.

-44-

APJL makes on appeal.

> First, 'during the case' means that the trustee may bring a motion for turnover against an entity who has possession of the property of the estate, or had possession of that property at some point during the bankruptcy case. Second, the phrase "or the value of such property" indicates that the entity need not be in possession of the property itself when the trustee files the motion for turnover. Because § 542(a) permits a trustee to recover 'the value of [the] property,' instead of just the property itself, possession cannot be required in order to bring the motion for turnover.

Shapiro v. Henson, 739 F.3d 1198, 2001 (9th Cir. 2014); see also Newman v. Schwartzer (In re Newman), 487 B.R. 193 (9th Cir. BAP 2013).

In sum, "the failure to return property of the estate with knowledge of the bankruptcy is a violation of both the automatic stay and of the turnover requirements of the Bankruptcy Code." Abrams v. Sw. Leasing and Rental Inc. (In re Abrams), 127 B.R. 239, 241–43 (9th Cir. BAP 1991) (creditor's continuing retention of repossessed vehicle after receiving notice of bankruptcy violated automatic stay). By its express terms, § 542(a) is self-executing and does not require the debtor to take any action or commence a proceeding or obtain a court order to compel the turnover. See Mwangi v. Wells Fargo Bank, N.A. (In re Mwangi), 432 B.R. 812, 823 (9th Cir. BAP 2010). Accordingly, we conclude that the bankruptcy court properly found that APJL violated the automatic stay by retaining property which was property of the estate.

The bankruptcy court also found APJL's offsets of prepetition expenses against debtor's postpetition draws violated the automatic stay. APJL does not address this finding

-45-

with any specificity on appeal.  To assert the right to setoff or pursue satisfaction of his or her claim, a creditor must seek relief from the automatic stay.  § 362(d)(1).  Further, "[t]he decision to award setoff rests squarely within the discretion of the Bankruptcy Court."  Hal Inc. v. United States (In re Hal, Inc.), 122 F.3d 851, 854 (9th Cir. 1997).  Because no final accounting was completed in this record, we do not know if APJL did offset any prepetition expenses, but this has no effect on our decision to affirm.

### 3.    The Contempt Order

Contempt damages under § 362(k) are available to individuals, but because neither debtor as a corporation nor Trustee may seek contempt damages under § 362(k), contempt damages are available under § 105.  Havelock v. Taxel (In re Pace), 67 F.3d 187, 192 (9th Cir.1995).

Under § 105, "[t]he standard for finding a party in civil contempt is well settled:  The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court."  Knupfer v. Lindblade (In re Dyer), 322 F.3d 1178, 1190-91 (9th Cir. 2003).  The movant must prove that the creditor (1) knew the automatic stay was applicable and (2) intended the actions which violated the injunction.  Id.; Zilog, Inc. v. Corning (In re Zilog, Inc.), 450 F.3d 996, 1007-08 (9th Cir. 2006).  "Knowledge of the injunction, which is a prerequisite to its willful violation, cannot be imputed; it must be found."  In re Zilog, Inc., 450 F.3d at 1008; see also In re Dyer, 322 F.3d at 1191-92 (contempt sanctions upheld where creditor

-46-

admitted having notice of the automatic bankruptcy stay, yet took no steps to remedy his violation of the stay).

APJL does not mention these standards in this appeal. Rather, it argues that it should not be held in contempt because debtor's demand to pay $184,000 was not the proper subject of a "turnover" demand based on the holding in In re Nat'l Audit Def. Network, 332 B.R. at 911 (citing MCI Telecommunications Corp. v. Gurga (In re Gurga), 176 B.R. 196, 199 (9th Cir. BAP 1994) ("turnover proceedings involve return of **undisputed** funds. . . .")). There, the bankruptcy court noted that "settled and controlling law holds that the presence of an active dispute over the amount owed takes the action out of the turnover area; one cannot shortcut a breach of contract action with a turnover demand." Id.

Here, APJL argues that the parties were in a dispute over an accounting issue. However, APJL again confuses the accounting issue with the property of estate issue. The proper distribution of debtor's property is at issue in the pending adversary proceeding which includes a request for an accounting. We agree that there are material disputes with respect to the accounting, but that does not excuse APJL from turning over property of the estate for purposes of maintaining the status quo.

We are also not convinced that it was "impossible" for APJL to comply with debtor's demand for return of the $184,000. First, APJL contends that the return of these funds cannot be the subject of a turnover order since they related to the CC Fees and Manager's Salary and other expenses which involve

-47-

breach of contract. This argument we already addressed.

APJL next argues that since the demand for the return of $184,000 was not tied to the funds actually in the Augmentation Account, all the pleadings and hearings thereafter were focused on accounting issues. According to APJL, the bankruptcy court's attempt to combine the two issues led to the illogical result that improperly punishes APJL for claims that were never raised in the pleadings. Thus, according to APJL, the court improperly held that APJL had the ability to comply with a court order.

These arguments have nothing to do with the impossibility defense to a contempt order. To successfully assert this defense, APJL as the alleged contemnor must establish "categorically and in detail" its inability to comply with the court's order. Affordable Media, LLC, 179 F.3d at 1239. As noted by the bankruptcy court, APJL did not meet its burden. There is nothing in the record that shows APJL lacked resources to turn over the funds from other sources. More significantly, APJL could have frozen the account on October 1, 2012, or requested debtor to assert the automatic stay against the credit card companies. See Moratzka v. Visa USA (In re Calstar, Inc.), 159 B.R. 247 (Bankr. D. Minn. 1993) (recovery of chargebacks from postpetition deposit is a violation of § 549 and the automatic stay). Instead, APJL conducted its late September reconciliations without notifying debtor and then ignored debtor's demand to freeze the account and return the funds associated with the previously undisclosed charges. Even setting aside whether APJL had the ability to return the disputed $184,000, it clearly could have turned over the funds

in the account on October 1, 2012. As the bankruptcy court observed, APJL alone was "responsible for the inability to comply." In re Count Liberty, LLC, 370 B.R. 259, 275 (Bankr. C.D. Cal. 2007).

### 4. Damages

APJL complains that the damages award was improperly calculated and inequitable.

The basis for the equitable argument is that the bankruptcy court is to blame for the accrued attorney's fees and the other damages. APJL maintains that the "focus" of the hearings shifted after November 29, 2012, to the accounting issues raised in the OSC application which resulted in three hearings, multiple tentative rulings and interim orders, multiple pleadings, and thousands of pages of accounting records that the parties all reviewed. At the end of all these hearings, the bankruptcy court calculated the damages based on the amount of money that was actually in the Augmentation Account, which was never the focus of the inquiry all along. As a result, the parties spent tens of thousands of dollars arguing over accounting issues, which the court specifically ordered to be dealt with in the adversary proceeding. APJL contends that "[t]he entire cost of the Bankruptcy court's flawed process has been imposed upon APJL [because] the determination of what funds were in the Augmentation Account could have been decided at the November 29, 2012 hearing."

At the November 29, 2012 hearing, the following discussion took place:

MR. FAITH: Right. Well, your honor, I guess from my

standpoint, what I want to be able to communicate to the client is, look, if you put the money back in there, at least the relief from stay issue isn't still hanging over our head in terms of the OSC.

. . .

MR. FAITH: I don't know if you're saying that or not.

THE COURT: Well, I am . . . . Damages for pursuing stay violations . . . don't continue to actually recover the money once the stay violation has ended, but they end when the stay violation ends. So basically the client's damages for stay violation are going to go until it puts the money back. So that's its choice. I'm not saying it's going to give them a free pass for its conduct today. I'm just telling you, you want more time, you want more process, you can have it. If you take that time, you're going to be faced with a potential consequence.

It was APJL's counsel that requested the opportunity for further briefing and it was Parvizian's February 22, 2013 declaration that was inconsistent with his previous declaration. That inconsistency raised further questions regarding the CC Fees and Manager's Salary which had been automatically deducted from the Augmentation Account. Further briefing ensued due to the new issues raised. Thus, the focus did shift from the initial inquiry as to whether APJL had reimbursed itself for the offset expenses. Nonetheless, the record shows that APJL never complied with any of debtor's demands set forth in the October 1, 2012 Letter. Had APJL frozen the account when debtor requested, it would have been unnecessary for the bankruptcy court to determine what the amount of the funds were in the Augmentation Account as of October 1, 2012. Moreover, APJL never complied with the bankruptcy court's ruling on November 29, 2012 when it ordered APJL to turn over the $75,759 and $28,000 amounts related to its offset, nor did APJL comply

-50-

with the court's April 12, 2013 OSC which required APJL to return $171,346.17 to the Augmentation Account. Had APJL complied with either of the bankruptcy court's orders, the damages for its stay violation would have stopped accruing. In short, we are not persuaded by APJL's equitable argument, which also was raised for the first time on appeal. See Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills, 321 F.3d 878, 882 (9th Cir. 2003) (arguments raised for the first time on appeal are waived).

Finally, APJL contends that the bankruptcy court's award of actual damages required an evidentiary hearing because the funds at issue were "unaccounted for." In its memorandum decision, the bankruptcy court found:

> APJL's noncompliance with its automatic stay obligations and expenditure of the funds in the Augmentation Account for its own purposes has also caused actual damages to the estate in the amount of the deficiency between the funds on hand on October 1, 2012 and what was left when the funds were finally turned over. In its Supplemental Briefing on July 17, 2013 in response to the OSC, APJL admitted $133,265.98 was in the Augmentation Account when counsel initially requested it be frozen on September 25, 2012, and $116,702.74 was in the Augmentation Account on October 1, 2012 when Debtor's counsel informed APJL that it was in violation of the automatic stay. After October 1, 2012, an additional $44,394.12 was also deposited in the Augmentation Account. Had APJL frozen the account on October 1, 2012, $161,096.86 of Debtor's funds would have been preserved. After October 2012, APJL paid Debtor $64,539.62. By June 17, 2013, when APJL turned over the remaining funds in the Augmentation Account to the Chapter 7 Trustee, the balance had dwindled to $27,958.75. Of the original $161,096.86 that was available and could have been turned over to Debtor as of October 1, 2012, $68,598.49 is unaccounted for. These are the actual damages the Court awards to the estate.

The narrow question APJL raises on appeal is whether there is evidence to support the $68,598.49 award. APJL argues that

-51-

since the accounting of the funds is at issue in the adversary, it should have had the opportunity to respond by way of an evidentiary hearing. APJL contends that the unaccounted for funds are disputed.

However, the bankruptcy court awarded the amount of $68,598.49 because APJL failed to preserve those funds by freezing the account. While APJL tries to link the actual damages to an accounting dispute, APJL once again misses the point that the status quo is the policy behind the automatic stay. The fact that certain funds may be "unaccounted" for does not make debtor's actual damages any less. Under these circumstances, the lack of an evidentiary hearing was not an abuse of discretion.

Nonetheless, we conclude that the bankruptcy court's calculations regarding the actual damages are not supported by the record and thus clearly erroneous. The bankruptcy court apparently gave APJL double credit for the $27,958.75 it turned over to Trustee on May 28, 2013. In addition, although the court fixed the account balance from which it credited the monies paid over to debtor as of October 1, 2012, $36,000 of that credit was paid before October 1 and perhaps this credit was improperly given. Thus, the bankruptcy court's calculation of the damages award was clearly erroneous.

## VI. CONCLUSION

For the reasons stated, we AFFIRM the Compensation Order and AFFIRM the Damages Order in all respects except for the award of actual damages. We VACATE the award of actual damages and REMAND for further proceedings to determine the appropriate

amount.